## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **FERDINAND BENJAMIN, Individually and as the Personal Representative of the Estate of ENOCK BENJAMIN, Deceased**<br><br>**Plaintiff,**<br><br>v.<br><br>**JBS S.A.,** *et al.***,**<br><br>**Defendants.** | **Civil Action No. 2:20-cv-02594-JP** |

### [PROPOSED] ORDER

**AND NOW**, this _____ day of _____, 2020, upon consideration of Defendants JBS USA Food Company's, JBS USA Holdings, Inc.'s, JBS Souderton, Inc.'s, and Pilgrim's Pride Corporation's Motion to Dismiss, and any response thereto, it is hereby **ORDERED** that Defendants' Motion is **GRANTED**, and it is further **ORDERED** that Plaintiff's Complaint is dismissed with prejudice.

BY THE COURT

_____
**John R. Padova**
**United States District Judge**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FERDINAND BENJAMIN, Individually and as the Personal Representative of the Estate of ENOCK BENJAMIN, Deceased** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 2:20-cv-02594-JP** |
| **JBS S.A.,** *et al.***,** | |
| **Defendants.** | |

**MOTION TO DISMISS OF DEFENDANTS JBS USA FOOD COMPANY, JBS USA HOLDINGS, INC., JBS SOUDERTON, INC., AND PILGRIM'S PRIDE CORPORATION PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(2) AND 12(b)(6)**

Defendants JBS USA Food Company, JBS USA Holdings, Inc., JBS Souderton, Inc., and Pilgrim's Pride Corporation move to dismiss Plaintiff's Complaint and all causes of action set forth therein with prejudice. In support of this Motion, JBS USA Food Company, JBS USA Holdings, Inc., JBS Souderton, Inc., and Pilgrim's Pride Corporation rely on the accompanying Memorandum of Law, which is incorporated herein by reference.

WHEREFORE, JBS USA Food Company, JBS USA Holdings, Inc., JBS Souderton, Inc., and Pilgrim's Pride Corporation respectfully request that the Court grant this Motion and enter an Order in the form accompanying this Motion.

Dated: June 16, 2020                        Respectfully submitted,


                                            */s/ Molly E. Flynn*
                                            Molly E. Flynn (Pa. ID No. 205593)
                                            Mark D. Taticchi (Pa. ID No. 323436)
                                            Rebecca L. Trela (Pa. ID No. 313555)
                                            FAEGRE DRINKER BIDDLE & REATH LLP
                                            One Logan Square, Suite 2000
                                            Philadelphia, PA  19103-6996
                                            Telephone:    (215) 988-2700
                                            Facsimile:    (215) 988-2757

                                            *Attorneys for Defendants JBS USA Food Co.,*
                                            *JBS USA Holdings, Inc., JBS Souderton, Inc.,*
                                            *and Pilgrim's Pride Corp.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FERDINAND BENJAMIN, Individually and as the Personal Representative of the Estate of ENOCK BENJAMIN, Deceased**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**JBS S.A.,** *et al.*,<br><br>**Defendants.** | **Civil Action No. 2:20-cv-02594-JP** |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
OF DEFENDANTS JBS USA FOOD COMPANY, JBS USA HOLDINGS, INC.,
JBS SOUDERTON, INC., AND PILGRIM'S PRIDE CORPORATION
PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(2) AND 12(b)(6)**

Dated: June 16, 2020

*/s/ Molly E. Flynn*

Molly E. Flynn (Pa. ID No. 205593)
Mark D. Taticchi (Pa. ID No. 323436)
Rebecca L. Trela (Pa. ID No. 313555)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone:    (215) 988-2700
Facsimile:    (215) 988-2757

*Attorneys for Defendants JBS USA Food Co.,
JBS USA Holdings, Inc., JBS Souderton, Inc.,
and Pilgrim's Pride Corp.*

# TABLE OF CONTENTS

**Page**

I.     **INTRODUCTION**...................................................................................... 1

II.    **RELEVANT FACTUAL BACKGROUND**..................................................... 3

    A.     Plaintiff's alleged claims arose while federal, state, and local governments were scrambling to respond to the COVID-19 pandemic...................................... 3

    B.     Plaintiff's allegations and failure to allege facts that would support cognizable claims........................................................................... 4

    C.     Plaintiff's failed attempt to allege claims against Defendants other than Enock Benjamin's employer......................................................... 5

    D.     Procedural posture. ....................................................................... 6

III.   **ARGUMENT**........................................................................................... 7

    A.     The Court should dismiss Plaintiff's claims against JBS Holdings and Pilgrim's for lack of personal jurisdiction. ...................................... 7

         1.     Legal standard for dismissal under FRCP 12(b)(2). ................... 7

         2.     The Court does not have personal jurisdiction over JBS Holdings. ........ 10

         3.     The Court also lacks personal jurisdiction over Pilgrim's...................... 12

         4.     Neither JBS Holdings nor Pilgrim's is an alter ego of JBS Souderton. ........................................................................... 13

    B.     The Court should dismiss Plaintiff's claims for failure to state a claim upon which relief can be granted. ............................................... 14

         1.     The legal standard for dismissal under Rule 12(b)(6). ........................... 14

         2.     Plaintiff's claims against JBS Souderton are barred by the PWCA. ....... 15

         3.     The Court should stay or dismiss this case pursuant to the primary jurisdiction doctrine. ................................................................. 21

         4.     Plaintiff does not allege facts showing that any activity at JBS Souderton caused Enock Benjamin to contract COVID-19. ................... 27

         5.     The Complaint fails to state a claim for negligence against any Defendant because it does not allege facts sufficient to show a breach of any existing duty. .................................................... 29

         6.     Plaintiff's requests for punitive damages should be dismissed. .............. 33

              a.     Plaintiff's claim for punitive damages is preempted under federal law............................................................................... 33

              b.     To the extent Plaintiff's request for punitive damages is not preempted, it nevertheless fails under Pennsylvania law............. 38

i

## TABLE OF CONTENTS
(continued)

Page

C.    The Court should dismiss Plaintiff's fraud claims because Plaintiff failed to plead the claims with particularity. ................................................................ 41

**IV**.   **CONCLUSION** ........................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Agent Orange Prod. Liab. Litig.*,
  580 F. Supp. 690 (E.D.N.Y. 1984) ....................................................................37

*Alston v. St. Paul Ins. Co.*,
  612 A.2d 421 (Pa. 1992) ....................................................................................17

*Am. Airlines, Inc. v. Wolens*,
  513 U.S. 219 (1995)............................................................................................34

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................15

*Baykeeper v. NL Indus., Inc.*,
  660 F.3d 686 (3d Cir. 2011)..................................................................22, 24, 25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................14, 15, 27, 29

*Britax Child Safety, Inc. v. Nuna Int'l B.V.*,
  321 F. Supp. 3d 546 (E.D. Pa. 2018) ................................................................10

*Buckman v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001)......................................................................................35, 36

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)..........................................................................................8, 9

*Carson v. Tucker*,
  No. 5:20-cv-00399, 2020 WL 1953655 (E.D. Pa. Apr. 23, 2020)...................38, 40

*Carteret Sav. Bank, FA v. Shushan*,
  954 F.2d 141 (3d Cir. 1992).................................................................................7

*Cellucci v. Gen. Motors Corp.*,
  676 A.2d 253 (Pa. Super. 1996)........................................................................34

*Colo. River Water Conserv. Dist. v. United States*,
  424 U.S. 800 (1976)............................................................................................21

*Cooper v. Frankford Health Care Sys., Inc.*,
  960 A.2d 134 (Pa. Super. 2008).........................................................................30

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ........................................................................................33

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014) ....................................................................................8, 12

*DiMare v. MetLife Ins. Co.,*
    369 F. App'x 324 (3d Cir. 2010) ...................................................................42

*Drennon v. Phila. Gen. Hosp.,*
    428 F. Supp. 809 (E.D. Pa. 1977) .................................................................27

*Elkin v. Bell Tel. Co. of Pa.,*
    420 A.2d 371 (1980) ......................................................................................21

*English v. Gen. Elec. Co.,*
    496 U.S. 72 (1990) ........................................................................................34

*Farina v. Nokia Inc.,*
    625 F.3d 97 (3d Cir. 2010) ............................................................................36

*Ferrare v. IDT Energy, Inc.,*
    No. 14-cv-4658, 2015 WL 3622883 (E.D. Pa. June 10, 2015) ...............21, 23

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,*
    458 U.S. 141 (1982) ......................................................................................35

*Ford v. UNUM Life Ins. Co. of Am.,*
    351 Fed. App'x 703 (3d Cir. 2009) ...............................................................34

*Frederico v. Home Depot,*
    507 F.3d 188 (3d Cir. 2007) ..........................................................................41

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974) ......................................................................................34

*Gingold v. Audi-NSU-Auto Union, A.G.,*
    567 A.2d 312 (Pa. Super. 1989) ....................................................................34

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
    564 U.S. 915 (2011) ...................................................................................8, 11

*Hanson v. Denckla,*
    357 U.S. 235 (1958) ........................................................................................9

*Harvey v. Hassinger,*
    461 A.2d 814 (Pa. Super. 1983) ....................................................................38

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984) .......................................................................................7

*Hogan v. Raymond Corp.*,
    536 F. App'x 207 (3d Cir. 2013) .............................................................20, 21

*Hutchison ex rel. Hutchison v. Luddy*,
    870 A.2d 766 (Pa. 2005) ............................................................................38

*IMO Indus., Inc. v. Kiekert AG*,
    155 F.3d 254 (3d Cir. 1998) .............................................................8, 9, 12

*Knipe v. SmithKline Beecham*,
    583 F. Supp. 2d 602 (E.D. Pa. 2008) ........................................................35

*Kuney v. PMA Ins. Co.*,
    578 A.2d 1285 (Pa. 1990) ......................................................................16, 17

*Kurns v. R.R. Friction Prod. Corp.*,
    565 U.S. 625 (2012) ....................................................................................34

*LaSala v. Marfin Popular Bank Pub. Co.*,
    410 F. App'x 474 (3d Cir. 2011) .................................................................7

*Leflar v. Gulf Creek Indus. Park # 2*,
    515 A.2d 875 (Pa. 1986) .............................................................................19

*Lutz v. Rakuten, Inc.*,
    376 F. Supp. 3d 455 (E.D. Pa. 2019) .................................................9, 10, 14

*Martin v. Lancaster Battery Co. Inc.*,
    606 A.2d 444 (Pa. 1992) .........................................................................17, 18

*McDarby v. Merck & Co.*,
    949 A.2d 223 (N.J. App. Div. 2008) .......................................................34, 35

*MCI Telecomms. Corp. v. Teleconcepts, Inc.*,
    71 F.3d 1086 (3d Cir. 1995) ...................................................................22, 26

*Metcalfe v. Renaissance Marine, Inc.*,
    566 F.3d 324 (3d Cir. 2009) ........................................................................7

*Midlantic Nat'l Bank v. Hansen*,
    48 F.3d 693 (3d Cir. 1995) ..........................................................................11

*Moore v. John. F. Kennedy Mem'l Hosp.*,
    No. 93-3428, 1994 WL 2531 (E.D. Pa. Jan. 5, 1994) ..................................21

*Oeschle v. Pro-Tech Power, Inc.*,
    No. 03-cv-6875, 2006 WL 680908 (E.D. Pa. Mar. 15, 2006) ................................10

*Pa. R.R. Co. v. Vandever*,
    36 Pa. 298 (1860) .................................................................................................38

*Poyser v. Newman & Co., Inc.*,
    522 A.2d 548 (Pa. 1987) .................................................................16, 17, 19, 21

*Provident Nat'l Bank v. Calif. Fed. Sav. & Loan Assoc.*,
    819 F.2d 434 (3d Cir. 1987) ................................................................................7

*Remick v. Manfredy*,
    238 F.3d 248 (3d Cir. 2001) ................................................................................9

*Renner v. Lanard Toys Ltd.*,
    33 F.3d 277 (3d Cir. 1994) ................................................................................8

*Rural Cmty. Workers All. v. Smithfield Foods, Inc.*,
    No. 5:20-cv-06063, 2020 WL 2145350 (W.D. Mo. May 5, 2020) ............................24, 25, 26

*Shaffer v. Heitner*,
    433 U.S. 186 (1977) .............................................................................................8

*Shields v. Gen. Elec. Co.*,
    No. 18-cv-2421, 2020 WL 108618 (E.D. Pa. Jan. 9, 2020) ...............................34

*Shuker v. Smith & Nephew, PLC*,
    885 F.3d 760 (3d Cir. 2018) ................................................................................9

*Smith v. Am. Airlines, Inc.*,
    No. 16-156, 2016 WL 8735710 (E.D. Pa. Aug. 12, 2016) ...................................20

*Snyder v. Specialty Glass Prods., Inc.*,
    658 A.2d 366 (Pa. Super. 1995) .........................................................................17

*Travelers Indem. Co. v. Cephalon, Inc.*,
    620 F. App'x 82 (3d Cir. 2015) .........................................................................42

*United States v. W. Pac. R.R. Co.*,
    352 U.S. 59 (1956) .........................................................................................21, 22

*Walden v. Fiore*,
    571 U.S. 277 (2014) .............................................................................................8

*Wendler v. Design Decorators, Inc.*,
    768 A.2d 1172 (Pa. Super. 2001) ..................................................................17, 18

*West v. Nw. Airlines, Inc.*,
    995 F.2d 148 (9th Cir. 1993) ......................................................................35

*Winterberg v. Transp. Ins. Co.*,
    72 F.3d 318 (3d Cir. 1995) ..............................................................15, 16, 21

*Zimmerman v. Novartis Pharm. Corp.*,
    889 F. Supp. 2d 757 (D. Md. 2012) ............................................................35

## STATUTES, RULES & REGULATIONS

Executive Order No. 13917, "Delegating Authority Under the Defense Production
    Act With Respect to Food Supply Chain Resources During the National
    Emergency Caused by the Outbreak of COVID-19" ("Food Supply Chain
    Order")
    85 Fed. Reg. 26313, 26313 (Apr. 28, 2020) ..............................23, 35, 36

77 P.S. § 481(a) ......................................................................................15, 16, 19

42 Pa. C.S. § 5301 .........................................................................................10

42 Pa.C.S. § 5322(b), (c) .................................................................................8

50 U.S.C. § 4556(b) ........................................................................................36

Fed. R. Civ. P. 4(k)(1)(A) ................................................................................8

Fed. R. Civ. P. 9(b) ..........................................................................1, 3, 41, 42

Fed. R. Civ. P. 12(b)(1) ...............................................................................20, 21

Fed. R. Civ. P. 12(b)(2) ....................................................................1, 7, 12, 14

Fed. R. Civ. P. 12(b)(6) ............................................................................ *passim*

Fed. R. Evid. 201(b) ........................................................................................31

## OTHER AUTHORITIES

CDC, "Cases & Deaths among Healthcare Personnel,"
    https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html ........................29

CDC, "Coronavirus Disease 2019 (COVID-19): Cases in the U.S."; "Cases &
    Deaths by Jurisdiction,"
    https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html ..........................4

CDC, "Coronavirus Disease 2019 (COVID-19):  How It Spreads,"
    https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-
    spreads.html ...................................................................................................30

CDC, "Recommendations for Cloth Face Covers,"
  https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-
  cover.html ....................................................................................................31, 40

OSHA, "Guidance on Preparing Workplaces for COVID-19," OSHA 3990-03
  https://www.osha.gov/Publications/OSHA3990.pdf ......................................19, 29, 32, 39–40

Pa. Gov. Wolf Exec. Order, "Order of the Governor of the Commonwealth of
  Pennsylvania to Ensure the Efficient Allocation and Effective Use of Critical
  Medical Resources,"
  https://www.governor.pa.gov/wp-content/uploads/2020/04/20200408-GOV-
  Critical-Medical-Resources-Order.pdf ......................................................................32

U.S. Dep't of Agriculture, "USDA to Implement President Trump's Executive
  Order on Meat and Poultry Processors,"
  https://www.usda.gov/media/press-releases/2020/04/28/usda-implement-
  president-trumps-executive-order-meat-and-poultry ................................................24

U.S. Dep't of Labor, "Statement of Enforcement Policy by Solicitor of Labor
  Kate O'Scannlain and Principal Deputy Assistant Secretary for OSHA Loren
  Sweatt Regarding Meat and Poultry Processing Facilities,"
  https://www.dol.gov/newsroom/releases/osha/osha20200428-1 ............................24

World Health Organization, "Advice on the use of masks in the context of
  COVID-19:  Interim Guidance,"
  https://apps.who.int/iris/bitstream/handle/ 10665/331693/WHO-2019-nCov-
  IPC_Masks-2020.3-eng.pdf ..............................................................................31, 39

## I.      INTRODUCTION

Defendants JBS USA Food Company ("JBS Food"), JBS USA Holdings, Inc. ("JBS Holdings"), JBS Souderton, Inc., ("JBS Souderton"), and Pilgrim's Pride Corporation ("Pilgrim's") seek dismissal of all claims against them in accordance with Federal Rules of Civil Procedure 12(b)(2), 12(b)(6), and 9(b).[1]   First, the claims against JBS Holdings and Pilgrim's should be dismissed for lack of personal jurisdiction under Rule 12(b)(2).   The entity "JBS USA Holdings, Inc." has not existed for more than four-and-a-half years and thus cannot be subject to personal jurisdiction in this Court.   Similarly, Pilgrim's is not a Pennsylvania entity and lacks ties to the Commonwealth sufficient for the exercise of general personal jurisdiction.   Moreover, the Court lacks specific personal jurisdiction over JBS Holdings and Pilgrim's because the declarations submitted herewith prove that neither of them engaged in any conduct related to the allegations in Plaintiff's Complaint.   Thus, the Court should dismiss JBS Holdings and Pilgrim's for lack of personal jurisdiction.

Second, the Court should also dismiss the claims against Enock Benjamin's employer, JBS Souderton, because the Pennsylvania Workers' Compensation Act ("PWCA") provides the sole and exclusive means of recovery against employers for any injuries that are alleged to have occurred within the scope of employment.   Here, Plaintiff alleges that his now-deceased father, Enock Benjamin, contracted COVID-19 through his employment with JBS Souderton.   Because JBS Souderton is a workers' compensation subscriber, Plaintiff must pursue his alleged claims against JBS Souderton in accordance with the PWCA, and the Court should dismiss Plaintiff's claims against JBS Souderton.

---

[1]  Defendant JBS, S.A. has not been served with Plaintiff's Complaint and is not a party to this Motion filed on behalf of the other Defendants.

Third, any remaining claims should be dismissed or stayed under the primary jurisdiction doctrine.  Plaintiff's causes of action require a determination of whether, in what circumstances, and to what extent a meat processing company like JBS Souderton can be held legally responsible if an employee contracts COVID-19 in the workplace and is injured or dies as a result of that infection.  Another federal district court has already determined that the primary jurisdiction doctrine requires referral of these issues to OSHA because they fall squarely within the rubric of OSHA's special competence and mission of enforcing occupational safety and health standards. In the event this Court does not dismiss Plaintiff's claims, it should hold likewise.

Fourth, Plaintiff's claims against JBS Food, JBS Souderton, JBS Holdings, and Pilgrim's should also be dismissed under Rule 12(b)(6) for failure to state a claim.  Plaintiff has not alleged facts sufficient to show any causal link between any of Defendants' actions, omissions, or alleged misrepresentations and Enock Benjamin's infection with COVID-19.  Even if Defendants had adopted all the measures outlined in the Complaint—notwithstanding that Plaintiff advocates for measures that were discouraged or prohibited under federal guidelines at that time—Plaintiff cannot show those measures would have prevented Enock Benjamin from becoming infected with COVID-19.  Rather, Plaintiff's allegations show that the more likely cause of infection was the rapid community spread of COVID-19 in the Philadelphia area—outside of Enock Benjamin's workplace.  Without causation, Plaintiff does not have viable claims against Defendants.

Fifth, Plaintiff cannot satisfy the elements of his negligence claims because he cannot show Defendants' actions amounted to a breach of duty in the midst of a developing global pandemic and in light of the limited and conflicting scientific and medical knowledge at the time.

Sixth, Plaintiff's requests for punitive damages should be dismissed under Rule 12(b)(6) because Plaintiff has not pled—and cannot prove—any extreme or outrageous conduct warranting

punitive damages.  This is particularly so given the rapidly changing circumstances and conflicting guidance regarding COVID-19 around the time of Enock Benjamin's death.  In addition, Plaintiff's demand for punitive damages should be denied because it is preempted by federal law.  Pursuant to President Trump's invocation of the Defense Production Act and subsequent agency directives, the federal government assumed exclusive regulatory authority over U.S. meat processing facilities during the COVID-19 pandemic and, as such, is the sole authority that may sanction a meat processing facility for the manner in which it responds to the risk of COVID-19 transmission.  Because the federal government has completely preempted the field in which Plaintiff seeks to sanction and control Defendants' conduct using state punitive damages law, Plaintiff's requested remedy is preempted by federal law and should be dismissed.

Finally, Plaintiff's claims for fraudulent and intentional misrepresentations should be dismissed under Rule 9(b) because Plaintiff did not plead the claims with the requisite specificity. To properly plead such claims, Plaintiff must specifically identify the alleged misrepresentations and state who made them, when they were made, and who received them.  Plaintiff provides none of this information in the Complaint.  Thus, the Court should dismiss Plaintiff's claims for fraudulent and intentional misrepresentations.

## II.     RELEVANT FACTUAL BACKGROUND

### A.     Plaintiff's alleged claims arose while federal, state, and local governments were scrambling to respond to the COVID-19 pandemic.

Beginning around the second week of March 2020, nearly every facet of daily life in the United States was upended.  Global supply chains for medical supplies, food, and other necessities were disrupted.  Stay-at-home orders left non-essential businesses, office buildings, shopping malls, and public spaces deserted, while "essential workers" were asked to continue life-sustaining services.  Tens of millions of jobs evaporated almost overnight.  Meanwhile, the President, the

U.S. Department of Labor Occupational Safety and Health Administration ("OSHA"), the Centers for Disease Control and Prevention ("CDC"), and other government and scientific agencies scrambled to issue numerous, conflicting guidance documents regarding safety protocols for workers and the general public.

Despite widespread social distancing practices and the closure of numerous businesses, the COVID-19 pandemic swept across the United States.  As of today, more than 2 million Americans and more than 79,000 Pennsylvanians have been infected with COVID-19.  *See* CDC, "Coronavirus Disease 2019 (COVID-19): Cases in the U.S." and "Cases & Deaths by Jurisdiction," (last visited June 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.  This is the backdrop for Plaintiff's claims.

**B.** **Plaintiff's allegations and failure to allege facts that would support cognizable claims.**

While the Complaint contains numerous allegations regarding the history of COVID-19 and JBS Souderton's operations, the allegations necessary to evaluate this Motion are simple. Plaintiff alleges Enock Benjamin worked at JBS Souderton and that he died of respiratory failure caused by COVID-19 on April 3, 2020.  (*See* ECF 1-1 ("Compl.") ¶¶ 2–3; *see also id.* at ¶ 47 ("In 2008, Enock Benjamin started working at the JBS Plant in Souderton, PA.").)  Plaintiff also alleges Enock Benjamin contracted COVID-19 "while working" at JBS Souderton.  (*Id.* at ¶ 10.)  Notably, Plaintiff has not alleged that Enock Benjamin worked on the "packing and processing line" where workers allegedly "stand only a few feet apart."  (*Id.* at ¶ 53.)

Plaintiff also does not allege that Enock Benjamin had direct contact with any other JBS Souderton employee who tested positive for COVID-19.  (*See generally id.*)  Indeed, Plaintiff's allegations indicate that as of March 30, 2020, JBS Food—the alleged parent company of JBS Souderton—"only had 'four or five' confirmed COVID-19 cases among its hourly workers."  (*Id.*

4

at ¶ 71.)  To put that number into context, the JBS Souderton facility alone employs approximately 1,400 workers.  (*Id.* at ¶ 49.)

Plaintiff also omits any assertion that would foreclose the likelihood that Enock Benjamin contracted COVID-19 outside of work, such as alleging Enock Benjamin had no contacts with a COVID-19 infected person at home, at the grocery store, or anywhere else he visited in the days and weeks preceding his illness.  Thus, Plaintiff does not allege any facts showing Defendants' actions caused Enock Benjamin to become infected with COVID-19.

**C.  Plaintiff's failed attempt to allege claims against Defendants other than Enock Benjamin's employer.**

Plaintiff attempts to plead causes of action for negligence, fraudulent misrepresentation, and intentional misrepresentation and claims under the Wrongful Death Act and Survival Act against five defendants.  (*Id.* ¶¶ 147–195.)  In addition to suing Enock Benjamin's employer—JBS Souderton—Plaintiff names the following companies as co-defendants: (1) JBS S.A.; (2) JBS Food; (3) JBS Holdings; and (4) Pilgrim's.  (*Id.* ¶¶ 114–125, 130–133.)  Plaintiff does not allege that Enock Benjamin was employed by any of JBS Souderton's co-defendants or ever visited their offices.  (*See generally* Compl.)

In an attempt to establish liability against and jurisdiction over Defendants other than Enock Benjamin's employer, Plaintiff alleges "Defendants, JBS S.A., JBS USA Food Company, JBS USA Holdings, Inc., JBS Souderton, Inc., and Pilgrim's Pride Corporation, [sic] owned, operated, managed, and otherwise controlled the meat packing plant at 249 Allentown Road, Souderton, PA 18964" and that they "collectively and individually made decisions related to worker health, safety, protection, and sanitation in light of the COVID-19 pandemic."  (Compl. ¶¶ 138–139.)  But Plaintiff's conclusory allegations are disproven by the declarations attached hereto as Exhibits A and B, which show Defendants JBS Holdings and Pilgrim's did not directly

own, operate, manage, or otherwise control JBS Souderton or the Souderton facility and that the Court, therefore, lacks personal jurisdiction over them.

With respect to Defendant JBS Holdings, that corporation no longer exists.  (*See* Ex. A [Declaration of Kiersten Sommers-Folb ("Folb Decl.")] ¶ 6.)  On December 23, 2015, JBS Holdings converted from a Delaware corporation to a Delaware limited liability company.  (*See id.* at ¶ 5 and Attachment 1 thereto.)  That same day, the company was converted from a Delaware limited liability company to a non-Delaware entity—JBS USA Holding Lux S.à r.l., a Luxembourg entity.  (*Id*. ¶ 17 and Attachment 2 thereto).  Consequently, JBS Holdings has neither been in existence nor an active corporation for more than four years.  (*Id.*)  It has no assets, no bank accounts, and no employees.  (*See id.* at ¶ 7.)  Thus, JBS Holdings could not have engaged in any conduct in Pennsylvania, let alone the conduct alleged in the Complaint, and the Court does not have personal jurisdiction over JBS Holdings.

Pilgrim's also had no control over JBS Souderton.  Pilgrim's is a chicken company that produces chicken and chicken-based products.  (Ex. B [Declaration of Kurt Dellos ("Dellos Decl.")] at ¶ 4.)  By contrast, JBS Souderton "specializes in beef processing and packaging." (Compl. ¶ 49.)  Pilgrim's does not have any operations, assets, liabilities, offices, or other facilities located in the Commonwealth of Pennsylvania.  (Dellos Decl. ¶ 6.)  Nor is Pilgrim's involved in any way in JBS Souderton's operational or disaster response decisions.  (*Id.* at ¶ 11.)  For these reasons, the Court lacks personal jurisdiction over Pilgrim's.

## D.      Procedural posture.

Plaintiff filed his Complaint on May 7, 2020 in the Court of Common Pleas of Philadelphia County.  On May 14, 2020, JBS Food was served in Greeley, Colorado.[2]  JBS Food then timely

---

[2]  The service on JBS Food purported to also serve JBS Holdings.  As explained above, however, JBS Holdings had

removed the action to this Court on June 2, 2020.  After the case was removed, the Complaint was served on JBS Souderton and Pilgrim's.

JBS Food, JBS Souderton, JBS Holdings, and Pilgrim's now ask the Court to dismiss all five causes of action set forth in Plaintiff's Complaint with prejudice because his allegations do not establish viable causes of action against any Defendant.

## III.   ARGUMENT

### A.   The Court should dismiss Plaintiff's claims against JBS Holdings and Pilgrim's for lack of personal jurisdiction.

#### 1.   Legal standard for dismissal under FRCP 12(b)(2).

When evaluating a motion to dismiss for lack of personal jurisdiction in which there are contested facts, the plaintiff has the burden to "prov[e] by affidavits or other competent evidence that jurisdiction is proper."  *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009); *see Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992).  To meet this burden, a plaintiff must establish "with reasonable particularity sufficient contacts between the defendant and the forum state."  *Provident Nat'l Bank v. Calif. Fed. Sav. & Loan Assoc.*, 819 F.2d 434, 437 (3d Cir. 1987).  Further, the plaintiff must establish either that the "particular cause of action sued upon arose from the defendant's activities within the forum state ('specific jurisdiction') or that the defendant has 'continuous and systematic' contacts with the forum state ('general jurisdiction')."  *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 416 (1984)).  The plaintiff must make these showings by a preponderance of the evidence.  *See LaSala v. Marfin Popular Bank Pub. Co.*, 410 F. App'x 474, 476 (3d Cir. 2011).

General jurisdiction arises only in those states where a defendant is "at home"; for corporate entities such as JBS Holdings and Pilgrim's, this means the company's state of

---

not existed for more than four years and, therefore, could not have been served with the lawsuit.

incorporation and the state in which it has its principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). When general jurisdiction exists over a defendant, it may be sued in that state, even on claims that have no connection to its contacts with the state.

Specific jurisdiction, by contrast, "is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citation omitted). In addition, to support jurisdiction, the relationship between the defendant, the forum state, and the cause of action "must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (emphasis in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

Because there is no federal statute governing personal jurisdiction in this case, this Court applies the law of the state in which the district court sits. *See* Fed. R. Civ. P. 4(k)(1)(A); *see also Daimler*, 571 U.S. at 125 ("Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."). As relevant here, Pennsylvania's long-arm statute allows its courts to assert specific personal jurisdiction "to the fullest extent allowed under the Constitution of the United States," 42 Pa.C.S. § 5322(b), but limits the scope of that jurisdiction to "only [those] cause[s] of action or other matter[s] arising from . . . acts forming the basis of jurisdiction," *id.* § 5322(c). Consequently, the "court's inquiry is solely whether the exercise of personal jurisdiction over the defendant[s] would be constitutional." *Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 279 (3d Cir. 1994).

The analysis of whether the Due Process Clause permits personal jurisdiction "depends upon the relationship among the defendant, the forum, and the litigation." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998) (citing *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977))

(internal quotation omitted). To meet the constitutional requirement, a "plaintiff must show that the defendant has purposefully directed its activities towards the residents of the forum state or otherwise purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) (internal citation and quotation marks omitted). Moreover, the Due Process Clause requires a court to assess the existence of personal jurisdiction separately for each cause of action a plaintiff asserts. *See Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) ("[A] conclusion that the District Court has personal jurisdiction over one of the defendants as to a particular claim asserted by [the plaintiff] does not necessarily mean that it has personal jurisdiction over that same defendant as to [that plaintiff's] other claims.").

To establish specific personal jurisdiction, the "plaintiff must show that the defendant has constitutionally sufficient 'minimum contacts' with the forum." *IMO Indus.*, 155 F.3d at 259 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). If the plaintiff makes this showing through competent evidence, the "court must determine, in its discretion, that [exercising jurisdiction] would comport with traditional notions of fair play and substantial justice." *Id.* (internal quotation marks omitted).

In cases involving a foreign defendant who has not engaged in sufficient forum- and suit-related conduct to subject itself to personal jurisdiction on its own account, jurisdiction will not be found as to that foreign defendant unless the plaintiff can prove it is the "alter ego" of a defendant over which the district court *does* have jurisdiction. *See Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781 (3d Cir. 2018). To make that showing, "'a plaintiff must show that a parent company is operating the "day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent."'" *Lutz v. Rakuten, Inc.*, 376 F. Supp. 3d 455, 471 (E.D. Pa.

9

2019) (quoting *Britax Child Safety, Inc. v. Nuna Int'l B.V.*, 321 F. Supp. 3d 546, 555 (E.D. Pa. 2018) (quoting, in turn, *Oeschle v. Pro-Tech Power, Inc.*, No. 03-cv-6875, 2006 WL 680908, at *5 (E.D. Pa. Mar. 15, 2006))).

> Courts in this district look to ten factors when making that assessment:

> > (1) ownership of all or most of the stock of the related corporation; (2) common officers and directors; (3) common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) integrated sales system; (7) interchange of managerial and supervisory personnel; (8) performance by the related corporation of business functions which the principal corporation would normally conduct through its own agent or departments; (9) acting of the related corporation as marketing arm of the principal corporation, or as an exclusive distributor; and (10) receipt by the officers of the related corporation of instruction from the principal corporation.

*Id.* As demonstrated below, application of these principles to JBS Holdings and Pilgrim's shows that neither of them is subject to personal jurisdiction in this Court.

## 2. The Court does not have personal jurisdiction over JBS Holdings.

JBS Holdings ceased to exist in 2015. (*See* Folb Decl. ¶ 6.) As such, it neither purposefully directed activities towards residents of Pennsylvania nor purposefully availed itself of the privilege of conducting activities within Pennsylvania. JBS Holdings is not a resident of Pennsylvania, does not own property in Pennsylvania, and does not otherwise come within the categories set forth in Pennsylvania's general jurisdiction statute, 42 Pa. C.S. § 5301. (*See generally id.*)

On December 23, 2015, JBS Holdings converted from a Delaware corporation to a Delaware limited liability company. (*See id.* at ¶ 5 and Attachment 1 thereto.) That same day, the company was converted from a Delaware limited liability company to a non-Delaware entity— JBS USA Holding Lux S.à r.l., a Luxembourg entity. (*Id.* at ¶ 19 and Attachment 2 thereto). Consequently, JBS Holdings has neither been in existence nor an active corporation for more than four years. (*Id.*) It has no assets, no bank accounts, and no employees. (*See id.* at ¶ 7.)

For purposes of evaluating general jurisdiction, Third Circuit precedent establishes that an "inactive" corporation has no principal place of business and is instead a citizen of its state of incorporation only. *Midlantic Nat'l Bank v. Hansen*, 48 F.3d 693, 696 (3d Cir. 1995). Thus, JBS Holdings—when it was still in existence—was a citizen of Delaware, and the Court cannot have general jurisdiction over it.

Because the Court cannot exercise general jurisdiction over JBS Holdings, it must determine whether JBS Holdings is subject to specific personal jurisdiction under the facts of this case. The answer is that it is not. Because JBS Holdings did not exist during the time frame of the issues alleged in the Complaint, it could not have engaged in any activities that would give rise to specific personal jurisdiction. *See Goodyear Dunlop Tires*, 564 U.S. at 919 ("Specific jurisdiction, on the other hand, depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."). Without assets, bank accounts, or employees, JBS Holdings could not conduct business in Pennsylvania or anywhere else. In short, because Plaintiff cannot show that JBS Holdings conducted any business since 2015, Plaintiff cannot show that JBS Holdings availed itself of the privilege of conducting any activities within Pennsylvania during the timeframe at issue, let alone activities related to the conduct alleged in the Complaint.

In the event Plaintiff seeks instead to claim personal jurisdiction over JBS Holdings's successor entity, JBS USA Holding Lux S.à r.l., the Court should hold that it lacks personal jurisdiction over that entity, as well. That entity was created on December 23, 2015. (Folb Decl. at ¶ 17.) It is not even a United States citizen, as its jurisdiction of organization is Luxembourg. (*Id.* at ¶ 18.) Plaintiff cannot show that JBS USA Holding Lux S.à r.l. conducted business, had any contacts with, or otherwise availed itself of the privileges of conducting activities within

11

Pennsylvania. (*See id.* at ¶ 20.) Consequently, the Court lacks personal jurisdiction over JBS USA Holding Lux S.à r.l., and JBS Holdings should be dismissed from this lawsuit in accordance with Rule 12(b)(2). *See IMO Indus.*, 155 F.3d at 259.

       3.     **The Court also lacks personal jurisdiction over Pilgrim's.**

Unlike JBS Holdings, Pilgrim's still exists as a corporation. Even so, the Court does not have general jurisdiction over Pilgrim's because it is neither incorporated nor headquartered in Pennsylvania. (Compl. ¶ 130); *Daimler*, 571 U.S. at 138–39.

Specific jurisdiction is also lacking. Although the Complaint alleges in boilerplate fashion that Pilgrim's (along with the other Defendants) "owned, operated, managed, and otherwise controlled the meat packing plant at 249 Allentown Road, Souderton, PA 18964" and that Pilgrim's, "by and through [its] agents, servants, and/or employees, collectively and individually made decisions related to worker health, safety, protection, and sanitation in light of the COVID-19 pandemic" (Compl. ¶¶ 138–39), those assertions are belied by the Declaration of Kurt Dellos, attached hereto as Exhibit B.

As the declaration confirms, Pilgrim's does not own, operate, manage, or control any of the operations at the Souderton facility. (Dellos Decl. ¶¶ 7–13.) Nor did Pilgrim's have any role in formulating or implementing the policies and practices Plaintiff challenges as negligent. (*Compare id.* at ¶ 11 *with* Compl. ¶¶ 139, 151, 154.) Consequently, Pilgrim's could not have formulated or delivered the statements Plaintiff decries as fraudulently and intentionally misleading nor played a role in developing the policies Plaintiff alleges were negligent. (*See* Compl. ¶¶ 162, 170.) Consequently, the Court lacks personal jurisdiction over Pilgrim's, and the claims against Pilgrim's should be dismissed under Rule 12(b)(2).

### 4.     Neither JBS Holdings nor Pilgrim's is an alter ego of JBS Souderton.

Plaintiff also cannot establish personal jurisdiction over JBS Holdings or Pilgrim's by claiming they are alter egos of JBS Souderton.  As noted above, JBS Holdings no longer exists. JBS Holdings does not (1) own any stock in JBS Souderton or JBS Food, (2) share a marketing image or use of a trademark or logo with JBS Souderton or JBS Food, (3) share employees, officers, or directors with JBS Souderton or JBS Food, (4) have its sales system integrated with those of JBS Souderton or JBS Food, or (5) provide instruction to either JBS Souderton or JBS Food.  (Folb Decl. ¶¶ 8–11, 15.)  Moreover, there is no interchange of managerial or supervisory personnel between JBS Holdings and either JBS Souderton or JBS Food.  (*Id.* at ¶ 12.)  Neither JBS Souderton nor JBS Food perform business functions for JBS Holdings that it would normally conduct through its own agent or department; nor does either act as a marketing arm or exclusive distributor for JBS Holdings.  (*Id.* at ¶¶ 13–14.)  In short, JBS Holdings has nothing to do with the operations of JBS Souderton.[3]  (*Id.* at ¶ 16.)

Likewise, Pilgrim's and JBS Souderton are separate and independent companies.  (Dellos Decl. ¶ 7.)  Pilgrim's has no ownership interest in JBS Souderton; and JBS Souderton has no ownership interest in Pilgrim's.  (*Id.* at ¶ 8.)  Pilgrim's and JBS Souderton do not share any common assets or liabilities.  (*Id.* at ¶ 9.)  Pilgrim's and JBS Souderton have separate officers, directors, managers, supervisors, and employees that are not shared or interchanged between the companies.  (*See id.*)  Pilgrim's and JBS Souderton produce different products and have separate management, marketing, sales, production, and distribution systems that are also not shared or interchanged between the companies.  (*See id.*)  And Pilgrim's and JBS Souderton do not provide any type of business service or function to one another.  (*Id.*)

---

[3]  All of the foregoing facts are also true for JBS USA Holding Lux S.à r.l.  (Folb Decl. ¶¶ 21–28.)

Pilgrim's officers, directors, managers, supervisors, and employees do not receive any type of direction or instruction from any individual employed by JBS Souderton; and JBS Souderton's officers, directors, managers, supervisors, and employees do not receive any type of direction or instruction from any individual employed by Pilgrim's.  (*Id.* at ¶ 10.)  Likewise, Pilgrim's chain-of-command does not go through any individual employed by JBS Souderton; and JBS Souderton's chain-of-command does not go through any individual employed by Pilgrim's.  (*Id.*)

Pilgrim's also has no involvement in JBS Souderton's operational or disaster response decisions and, thus, had no involvement in the development or implementation of COVID-19 preparedness or mitigation plans for JBS Souderton or the Souderton facility.  (*Id.* at ¶ 11.) Pilgrim's has never owned, leased, managed, operated, or officed out of the Souderton facility. (*Id.* at ¶ 12.)  Further, Pilgrim's has never had any of its chicken products processed at or distributed from that facility.  (*Id.*)  And Pilgrim's has no officers, directors, managers, supervisors, or employees who work from or report to the Souderton facility.  (*Id.*)  In sum, Pilgrim's has no connection to JBS Souderton or the Souderton facility.

Because neither JBS Holdings nor Pilgrim's have control over JBS Souderton or its operations, they cannot be alter egos of JBS Souderton.  *See Lutz*, 376 F. Supp. 3d at 471.  Thus, the Court does not have personal jurisdiction over them.  Accordingly, this Motion should be granted, and both JBS Holdings and Pilgrim's should be dismissed under Rule 12(b)(2).

**B.     The Court should dismiss Plaintiff's claims for failure to state a claim upon which relief can be granted.**

**1.     The legal standard for dismissal under Rule 12(b)(6).**

To avoid dismissal under Rule 12(b)(6), Plaintiff's Complaint must allege "enough facts to state a claim to relief that is plausible on its face" in order to "nudge[] [his] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, minimum pleading standards "require[] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Instead, Plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," whose allegations are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

Although "a court must accept as true all of the allegations contained in a complaint," that principle is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).

### 2.    Plaintiff's claims against JBS Souderton are barred by the PWCA.

Plaintiff cannot assert a viable cause of action against JBS Souderton because any claims arising from his employment are barred by the exclusivity provision of the PWCA. The PWCA is the sole and exclusive means of recovery against employers for any injuries that are alleged to have occurred within the scope of employment. *See Winterberg v. Transp. Ins. Co.*, 72 F.3d 318, 322 (3d Cir. 1995). PWCA Section 481(a) states:

> The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employe[e]s, his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or

otherwise on account of any injury or death . . . or occupational disease.

77 P.S. § 481(a).

The PWCA's exclusivity mandate is a "'historical *quid pro quo* employers received for being subjected to a no-fault system of compensation for worker injuries.  That is, while the employer assumes liability without fault for a work-related injury, he is relieved of the possibility of a larger damage verdict in a common law action.'"  *Winterberg*, 72 F.3d at 322 (citing *Kuney v. PMA Ins. Co.*, 578 A.2d 1285, 1286 (Pa. 1990)).  The Third Circuit has explained that "[b]ecause of the historical background for Pennsylvania's workmen's compensation system, courts have been very cautious about permitting common law litigation in matters arguably connected with work-related injuries."  *Id.*

The Pennsylvania Supreme Court has also explained:

> [T]he comprehensive system of substantive, procedural, and remedial laws comprising the workers' compensation system should be the exclusive forum for redress of injuries in any way related to the workplace.  This principle was established as long ago as 1950.  This Court stated: 'A reading of this statute and its many amendments make it manifest that the legislation relating to workmen's compensation was designed and intended to establish exclusive jurisdiction, practice and procedure in all matters pertaining to such subject matter.  *When the allegations of a claim have as their ultimate basis an injury compensable under the Workmen's Compensation Act, the claim must be considered within the framework of the statute.*"

*Kuney*, 578 A.2d at 1287 (citations omitted) (emphasis added).

Nor does the fact that Plaintiff couched two of his claims as intentional torts remove this case from the immunity bar of the PWCA.  The Pennsylvania Supreme Court addressed this precise issue in *Poyser v. Newman & Co., Inc.*, 522 A.2d 548, 551 (Pa. 1987).  While the Court noted "that the appellate courts of some other states have held that wanton and willful misconduct by an employer is tantamount to an intentional tort, and as such, prevents the operation of a statutory

16

exclusive-remedy provision," "those cases rested on provisions in the state workmen's compensation statutes which expressly preserved the right of an employee to sue in tort where his injury was caused by the employer's intentional wrongdoing."  *Id.*  The Pennsylvania Supreme Court found those cases unpersuasive because the PWCA contains "no such provision."  *Id.*

Since *Poyser*, Pennsylvania courts have time and again held that the PWCA provides the exclusive remedy for employees even when intentional torts are alleged.  *See, e.g.*, *Alston v. St. Paul Ins. Co.*, 612 A.2d 421, 423–24 (Pa. 1992) (holding that the PWCA's exclusivity provision bars tort recovery for malicious and fraudulent conduct); *Kuney*, 578 A.2d at 1286–87 (barring fraud claims); *Wendler v. Design Decorators, Inc.*, 768 A.2d 1172, 1173–77 (Pa. Super. 2001) (granting summary judgment in employer's favor even though the record showed the employer willfully disobeyed OSHA warnings resulting in the employee's death); *Snyder v. Specialty Glass Prods., Inc.*, 658 A.2d 366 (Pa. Super. 1995) (holding that claim for emotional distress was barred by the exclusivity clause of the PWCA since there is no intentional tort exception to the PWCA). The same is true here.

Plaintiff will likely try to shoehorn this case into the narrow exception to the PWCA's exclusive remedy provision set forth in *Martin v. Lancaster Battery Co. Inc.*, 606 A.2d 444 (Pa. 1992).  But Plaintiff's allegations show that the *Martin* exception does not apply to the facts of this case.

In *Martin*, the employee was exposed to lead fumes at his place of employment and was given periodic blood tests to monitor the level of lead in his blood.  Martin's employer not only "willfully and intentionally withheld from Mr. Martin the results of Mr. Martin's blood tests" for three-and-a-half years—tests indicating Martin had been exposed to toxic levels of lead—but also "intentionally altered blood test results before forwarding the results to Mr. Martin." *Martin*, 606

A.2d at 446.  If Martin's employer had not concealed and altered the results of these blood tests, "[t]he severity of [Martin's] condition would have been substantially reduced."  *Id.*

The facts Plaintiff alleges here are nothing like those in *Martin*—no altered test results, no multi-year cover-up, and no resulting exacerbation of an existing injury or condition.  *Id.*  Simply put, the *Martin* exception has no application here.   Enock Benjamin's employer—JBS Souderton—did not test him for COVID-19 or conceal the results of any such test.  In fact, as of the date the Complaint was filed—May 7, 2020—Plaintiff alleges JBS Souderton still was "<u>not</u> regularly or consistently taking employee temperatures" and "was still <u>not</u> providing COVID-19 testing for all those at the facility."  (Compl. ¶¶ 107–09 (emphasis in original).)  Furthermore, Plaintiff alleges that when JBS Souderton learned one of its employees tested positive for COVID-19, it sent a letter to employees informing them of that fact.  (*See* Compl. ¶ 64 ("after the first positive COVID-19 result, JBS sent a letter to 'Souderton Team Members' stating that 'one of our team members has tested positive for COVID-19 after exhibiting flu-like symptoms'").)  Thus, JBS Souderton did not hide any information regarding a positive COVID-19 test, let alone a test showing Enock Benjamin was positive for COVID-19.

Pennsylvania courts have noted the narrow scope of the exception established in *Martin*.  "*Martin* stands for the proposition that both fraud and delay leading to the exacerbation of a work-related injury must be present to remove a claim from the exclusivity provision of the PWCA."  *Wendler*, 768 A.2d at 1176–77.  Thus, to fall within the *Martin* exception, Plaintiff would have to allege "[t]he severity of [Enock Benjamin's] condition would have been substantially reduced if his employer had not perpetrated a delay by failing to accurately report" that Enock Benjamin tested positive for COVID-19.  Plaintiff cannot allege that because JBS Souderton did not have any COVID-19 test results for Enock Benjamin and thus could not have withheld any such test

results.  Indeed, Plaintiff's allegations show that Enock Benjamin did not test positive for COVID-19 until after his death.  (*See* Compl. ¶ 97 ("An autopsy report confirmed the [sic] Enock Benjamin died from respiratory complications related to COVID.").)

Additionally, *Poyser* is particularly relevant here because it addresses OSHA rules, and Plaintiff alleges Defendants violated duties created by OSHA's "Guidance on Preparing Workplaces for COVID-19."  *See* OSHA, "Guidance on Preparing Workplaces for COVID-19," OSHA 3990-03 2020 (Mar. 9, 2020), https://www.osha.gov/Publications/OSHA3990.pdf ("OSHA COVID-19 Guidance").  In *Poyser*, the plaintiff contended his employer knew the machine on which he was injured violated existing safety requirements and that his employer, therefore, concealed the machine from OSHA inspectors.  *See* 522 A.2d at 550 (employer "knew that the 'notching' machine did not comply with federal and state safety regulations, and, for that reason, directed the appellant to remove it on the eve of an OSHA inspection which took place about eleven days before the accident").  Nevertheless, the Pennsylvania Supreme Court held that the PWCA provided the exclusive remedy for the plaintiff's claims.  *See id.* at 551.  As in *Poyser*, Plaintiff's claims in this case are barred by the PWCA despite Plaintiff's attempt to assert causes of action based on the OSHA COVID-19 Guidance.

Here, the evidence submitted with JBS Food's Notice of Removal [ECF 1] shows that JBS Souderton was a workers' compensation subscriber in the Commonwealth of Pennsylvania during the relevant time period.  (*See* ECF 1-2 [Keller Decl.] at ¶¶ 12–13; ECF 1-3 [Rockwell Decl.] at ¶¶ 3–4 and Attachment 1 thereto.)  Moreover, because PWCA Section 481(a) applies, the PWCA wholly precludes Plaintiff from asserting in a judicial forum the claims set forth in the Complaint.  *See Leflar v. Gulf Creek Indus. Park # 2*, 515 A.2d 875, 879 (Pa. 1986).  Consequently, Plaintiff has failed to state a claim upon which relief can be granted against JBS Souderton.

Importantly, the Court should dismiss the claims against JBS Souderton with prejudice under Rule 12(b)(6).  Plaintiff is likely to argue that if the PWCA's exclusive remedy bar applies, the appropriate remedy is dismissal without prejudice for lack of subject matter jurisdiction under Rule 12(b)(1).  To the extent Plaintiff raises that argument, the Court should reject it because the Court has federal question jurisdiction in this case.

In many cases addressing the PWCA, the federal court's jurisdiction is based solely on diversity.  *See, e.g.*, *Hogan v. Raymond Corp.*, 536 F. App'x 207 (3d Cir. 2013).  In those cases, the court must decide whether a non-diverse employer has been fraudulently joined to defeat diversity jurisdiction.  If the court determines the PWCA bars the claims against the non-diverse employer, the proper course is generally to dismiss the employer without prejudice for lack of subject matter jurisdiction under Rule 12(b)(1).  *See id.* at 211 ("The fraudulent joinder inquiry is a jurisdictional one and not a merits determination. . . . Thus, instead of dismissing Hogan's claims against Giant with prejudice under Rule 12(b)(6), the District Court should have dismissed them for lack of subject matter jurisdiction under Rule 12(b)(1).").  But this case is different because the Court's jurisdiction is not based solely on diversity.  (*See* ECF 1 at pp. 13–18.)

Because the Court has federal question jurisdiction in addition to diversity jurisdiction, it has subject matter jurisdiction over Plaintiff's claims against JBS Souderton notwithstanding the PWCA's exclusive remedy bar.  Thus, the Court can determine on the merits whether Plaintiff's claims against JBS Souderton are barred by the PWCA.  *See Smith v. Am. Airlines, Inc.*, No. 16-156, 2016 WL 8735710, at *1 (E.D. Pa. Aug. 12, 2016) (dismissing employees' claims under Rule 12(b)(6) where "Defendants removed the state court action to federal court pursuant to the Class Action Fairness Act of 2005" and plaintiff's claims were barred by the PWCA's exclusivity provision).

Plaintiff's claims in the present case "are barred beyond question under Pennsylvania law." *Hogan*, 536 F. App'x at 210 (citing *Winterberg*, 72 F.3d at 322 and *Poyser*, 522 A.2d at 550–51). And because the claims meet the standard for dismissal under Rule 12(b)(1), they also meet the lower standard for dismissal under Rule 12(b)(6). *See Moore v. John. F. Kennedy Mem'l Hosp.*, No. 93-3428, 1994 WL 2531, at *1 (E.D. Pa. Jan. 5, 1994) (Padova, J.) (noting the standard for dismissal under Rule 12(b)(6) is lower than that under Rule 12(b)(1)). Thus, the Court should dismiss Plaintiff's claims against JBS Souderton with prejudice under Rule 12(b)(6) rather than dismissing them without prejudice under Rule 12(b)(1).[4]

### 3. The Court should stay or dismiss this case pursuant to the primary jurisdiction doctrine.

Notwithstanding the general rule that the federal courts should "exercise the jurisdiction given them," *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976), the Supreme Court has recognized a narrow class of cases that, although "cognizable in the courts," should instead be "referr[ed] . . . to the administrative body" that possesses "special competence" with respect to the issues underlying the claim, *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956). "'Essentially, the [primary jurisdiction] doctrine creates a workable relationship between the courts and administrative agencies wherein, in appropriate circumstances, the courts can have the benefit of the agency's views on issues within the agency's competence.'" *Ferrare v. IDT Energy, Inc.*, No. 14-cv-4658, 2015 WL 3622883, at *3 (E.D. Pa. June 10, 2015) (quoting *Elkin v. Bell Tel. Co. of Pa.*, 420 A.2d 371, 376 (1980)). Primary jurisdiction for an administrative agency exists when "the dispute involves issues that are clearly better resolved in the first instance by the administrative agency charged with regulating the subject matter of the dispute," even "where the

---

[4] In the unlikely event the Court determines it has diversity jurisdiction but not federal question jurisdiction, Plaintiff's claims against JBS Souderton should be dismissed in accordance with Rule 12(b)(1). *Hogan*, 536 F. App'x at 210-11.

administrative agency cannot provide a means of complete redress to the complaining party." *See MCI Telecomms. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1105 (3d Cir. 1995).

"No fixed formula exists for applying the doctrine of primary jurisdiction." *W. Pac. R.R. Co.*, 352 U.S. at 64. Even so, courts in this Circuit tend to look to at least four factors in assessing whether a primary jurisdiction referral is warranted:

> (1) Whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) Whether the question at issue is particularly within the agency's discretion; (3) Whether there exists a substantial danger of inconsistent rulings; and (4) Whether a prior application to the agency has been made.

*Baykeeper v. NL Indus., Inc.*, 660 F.3d 686, 691 (3d Cir. 2011).

Because all of these factors weigh in favor of a primary jurisdiction referral in this case, the Court should stay or dismiss this case so that the core issue of JBS Souderton's compliance with the relevant CDC and OSHA guidance may be resolved by the agencies possessing the relevant expertise in making those determinations.

On the facts presented here, the first two *Baykeeper* factors—the relative saliences of judicial and agency expertise and whether the issue is within the agency's discretion—overlap significantly in this case, and thus are discussed together. The federal regulatory response to the COVID-19 pandemic takes this case out of the category of cases "within the conventional experience of judges." *Baykeeper*, 660 F.3d at 691. Indeed, Plaintiff's Complaint repeatedly makes plain that some of the central questions in this case will be whether, in what circumstances, and to what extent a meat processing company like JBS Souderton can be held legally responsible if an employee contracts COVID-19 in the workplace and sustains physiological or monetary harm

as a result of that infection.[5]  (Compl. ¶¶ 23–24 (purporting to paraphrase CDC guidance); *id.* ¶ 25 (quoting OSHA guidance); *id.* ¶ 58 (same); *id.* ¶¶ 89–90, 99, 154(h)–(k), (v), 182(f), (j) (alleging violation of CDC and OSHA guidance)).

The foregoing questions have already been committed to the judgment and discretion of the Department of Agriculture, the CDC, and OSHA.  *See Ferrare*, 2015 WL 3622883, at *3 (rejecting plaintiff's argument that "'the questions at issue relate[d] to a simple breach of contract claim which is within the conventional experience of th[e] Court,'" because deciding the claim would require an assessment of an electricity supplier's rate calculations and whether those calculations complied with agency regulations).  Numerous Executive Branch pronouncements have made clear that *federal* authorities are making both the policy decision of how workplace safety should be balanced against the continued operation of meat processing plants and also the discretionary enforcement decisions concerning whether, when, and how to regulate compliance with that federally mandated balance.

The most significant of these statements is the President's April 28, 2020 Executive Order, which directed that "the *Secretary of Agriculture* shall take all appropriate action under [the Defense Production Act] to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued *by the CDC and OSHA*."  (*See* 85 Fed. Reg. 26313, 26313 (Apr. 28, 2020) ("Food Supply Chain Order") (emphases added).)  Consistent with that delegation of authority, the Secretary of Agriculture declared, on the same day that the Food Supply Chain Order was issued, that "*USDA* will work with meat processing [companies] to affirm they will operate in accordance with the CDC and OSHA guidance, and then work with state and

_____

[5]  As noted elsewhere in this Motion, Defendants doubt the accuracy of Plaintiff's claim that Enock Benjamin contracted COVID-19 at the JBS Souderton facility, but nevertheless treat that statement as true for purposes of this Motion.

local officials to ensure that these plants are allowed to operate." *See* U.S. Dep't of Agriculture, "USDA to Implement President Trump's Executive Order on Meat and Poultry Processors," (Apr. 28, 2020), https://www.usda.gov/media/press-releases/2020/04/28/usda-implement-president-trumps-executive-order-meat-and-poultry (emphasis added). As this statement underscores, it is federal agency actors who will liaise with both meat processing facilities and state and local officials in order to secure the Food Supply Chain Order's twin goals: integrity of the nation's food supply and maintenance of reasonable working conditions at the relevant facilities.

Additional contemporaneous confirmation of the extent of federal agency control over these issues came in the form of a statement of enforcement policy from the Solicitor of Labor and the Principal Deputy Assistant Secretary of OSHA. *See* U.S. Dep't of Labor, "Statement of Enforcement Policy by Solicitor of Labor Kate O'Scannlain and Principal Deputy Assistant Secretary for OSHA Loren Sweatt Regarding Meat and Poultry Processing Facilities" (Apr. 28, 2020), https://www.dol.gov/newsroom/releases/osha/osha20200428-1. In that guidance document, the Department of Labor acknowledged that not all aspects of the guidance standards will be feasible for every facility and explained that OSHA therefore "*will use enforcement discretion* for employers adhering to appropriate guidance," and would "take into account good faith attempts to follow the Joint Meat Processing Guidance," if any investigative activities did ensue. *Id.* (emphasis added).

As these pronouncements show, the core issues in this case implicate both policy judgments and discretionary enforcement decisions that are squarely within the competence of OSHA (and its sister agencies), not the courts. The first two *Baykeeper* factors thus weigh strongly in favor of a stay of this case pending a referral of the matter to OSHA. *See Rural Cmty. Workers All. v. Smithfield Foods, Inc.*, No. 5:20-cv-06063, 2020 WL 2145350, at *8 (W.D. Mo. May 5,

2020) ("Plaintiffs' claims both succeed or fail on the determination of whether the Plant is complying with the Joint Guidance. Due to its expertise and experience with workplace regulation, OSHA (in coordination with the USDA per the Executive Order) is better positioned to make this determination than the Court is. Indeed, this determination goes to the heart of OSHA's special competence: its mission includes 'enforcing' occupational safety and health standards.").

The third primary jurisdiction factor—the risk of inconsistent rulings—similarly tips in favor of referral. As just one illustration, consider Plaintiff's assertion that Defendant JBS Food "operates scores of beef plants nationwide." (Compl. ¶ 83.) It requires little imagination to see how, if a primary jurisdiction referral were denied here, JBS Food could be subject to conflicting judicial determinations regarding the adequacy of its COVID-19 mitigation efforts and the efforts of those "scores" of JBS-affiliated meat processing facilities to comply with the CDC/OSHA joint guidance. Indeed, at least one other court has already recognized such risks to another meat processor and granted a motion to refer a COVID-19-related suit to OSHA for resolution. *See Smithfield Foods*, 2020 WL 2145350, at *8 (explaining referral of plaintiff's tort claims against a meat processing plant to OSHA under the primary jurisdiction doctrine was necessary to "ensure uniform national enforcement of the Joint [CDC and OSHA] Guidance"); *id.* ("If the Court ruled on whether the Plant is complying with the Joint Guidance, this ruling would be binding on Smithfield but not other meat processing facilities because the Court lacks personal jurisdiction over them. Thus, any determination by this Court whether the Plant is complying with the Joint Guidance could easily lead to inconsistent regulation of businesses in the same industry.").

The fourth *Baykeeper* factor—prior submission to agency review—also weighs in favor of a primary jurisdiction referral here. By letter dated April 17, 2020, OSHA initiated a Rapid Response Investigation into the death of Enock Benjamin. (*See* Ex. C.) JBS Souderton, Inc.

responded (*see* Ex. D), and OSHA closed the investigation on May 14th without issuing a citation or any adverse conclusion.  (*See* Ex. E.)  OSHA's pre-existing interest and involvement in this matter substantially diminishes any "learning curve" that might be required following referral by this Court—and, consequently, should aid in the speedy resolution of the parties' dispute.  *See Smithfield Foods*, 2020 WL 2145350, at *2 (noting that OSHA's initiation of a "Rapid Response Investigation," in which it requested "information regarding [defendant Smithfield's] COVID-19 work practices," weighed in favor of a primary jurisdiction referral).

Finally, Plaintiff may argue that a primary jurisdiction referral is improper because the remedies from OSHA are less than the range of remedies available to him in this Court, or may argue that some of the guidance Plaintiff invokes in his Complaint—including, in particular, the joint CDC/OSHA guidance—did not issue until after Enock Benjamin's death.  Neither argument is availing.

On the remedies point, the Third Circuit has explained that the doctrine has strong purchase regardless of the remedial power of the relevant agency because it allows the two institutional actors—agency and court—to bring their respective strengths to bear on the aspects of the case to which they are best suited:  agency expertise on the core questions determining liability and judicial expertise in fashioning any remedy required based on the agency's antecedent decision. *MCI Telecomms.*, 71 F.3d at 1106 ("[A]lthough the district court had jurisdiction over the third-party claim, the court erred in deciding the question of liability.  That claim must be transferred to the [agency] for such a determination.  If the [agency] concludes that [the third-party plaintiff] is entitled to indemnification from [the third-party defendant], the district court may then make an appropriate award to [the third-party plaintiff].").

Nor is the fundamental purpose or utility of an agency referral affected by the fact that the joint CDC/OSHA guidance did not issue until after Enock Benjamin's death.  Indeed, the strong interest in national uniformity discussed above would be seriously—and pointlessly—undermined if agency referrals were available for cases where the injury in question post-dated the joint guidance but not those that occurred in earlier phases of a national emergency.  *Cf. Drennon v. Phila. Gen. Hosp.*, 428 F. Supp. 809, 817–18 (E.D. Pa. 1977) (referring case to the Department of Labor even though procedures for administrative consideration of the claims at issue in the case were not in effect at the time Plaintiff commenced his suit); *id.* at 817 ("The administrative agency is not precluded from considering the plaintiff's claims, despite the fact that no remedies were available at the time this lawsuit was filed.").

For all these reasons, the Court should dismiss this case or stay and refer it to OSHA for resolution of the question whether the JBS Souderton meat processing facility complied with the joint CDC/OSHA guidance.

> **4.    Plaintiff does not allege facts showing that any activity at JBS Souderton caused Enock Benjamin to contract COVID-19.**

All of Plaintiff's claims are premised on the assumption that Enock Benjamin contracted COVID-19 because of his employment at JBS Souderton.  But Plaintiff fails to allege any facts that would establish such a causal link—*i.e.*, that but for Defendants' alleged conduct, Enock Benjamin would not have contracted COVID-19.  Consequently, the Complaint does not "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

First, Plaintiff's Complaint does not include any allegations about the manner in which Enock Benjamin contracted COVID-19 other than to allege transmission occurred "while working."  (*See generally* Compl.)  But Plaintiff *does* allege facts showing Enock Benjamin could have contracted COVID-19 through community spread.  For example, Plaintiff alleges the first

case of COVID-19 acquired by community transmission was reported on January 30, 2020—more than two months before Enock Benjamin's death.  (*Id.* at ¶ 20.)  Plaintiff also admits COVID-19 is a global pandemic, that the virus "is highly contagious," and that it is "especially dangerous because it can be spread by people who are asymptomatic or pre-symptomatic."  (*Id.* at ¶¶ 14 and 16.)  In addition, Plaintiff contends many people who contracted COVID-19 became infected through community spread and "are not sure how or where they became infected."  (*Id.* at ¶ 21.)  The Complaint reflects the same uncertainty regarding Enock Benjamin's own contraction of COVID-19.

The foregoing allegations preclude a finding that the Complaint *plausibly* alleges that Enock Benjamin contracted COVID-19 at the Souderton facility.  Indeed, Plaintiff alleges that as of March 30, 2020—three days after Enock Benjamin's final day at the facility—"JBS Food . . . only had 'four or five' confirmed COVID-19 cases among its hourly workers."  (*Id.* at ¶ 71.)

Even if four or five "JBS Food" employees tested positive for COVID-19 within a few days of Enock Benjamin's last day at the Souderton facility, Plaintiff does not allege that any of these positive cases were in the Souderton facility, or that Enock Benjamin had any transmissible contact with these individuals.  More importantly, Plaintiff's allegations show there was extensive parallel community spread, which was just as likely—if not more likely—to be the source of Enock Benjamin's infection.  (*See* Compl. ¶ 26 (alleging "over 240,000 confirmed COVID-19 infections in the United States, and 5,794 confirmed deaths" as of April 2, 2020) and ¶ 69 ("there were over 2,000 confirmed cases of COVID-19 in Pennsylvania" as of March 27, 2020—Enock Benjamin's last day at the Souderton facility).)

Second, Plaintiff fails to allege facts that plausibly show Enock Benjamin's COVID-19 infection would have been prevented by the use of PPE and other measures Plaintiff advocates in

the Complaint.  Indeed, OSHA considered PPE the "least-effective mechanism for protecting employees from workplace transmission of COVID-19." (*See* OSHA COVID-19 Guidance at 14.) The alarming number of COVID-19 infection among healthcare providers shows the fallacy of Plaintiff's theory.  *See* CDC, "Cases & Deaths among Healthcare Personnel," (last visited June 16, 2020),  https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html  (more than 77,000 healthcare personnel infected as of the date of this filing).  Put simply, Plaintiff's argument, stripped of its labels and doctrinal couching, boils down to the assertion that Defendants should be strictly liable for any COVID-19-related injury or death of a JBS Souderton employee.  That is not—and cannot be—the law.

To "nudge[] [his] claims across the line from conceivable to plausible" Plaintiff would have to allege that no family member or other person with whom Enock Benjamin had sustained, casual, or even fleeting contact outside of work in the two weeks or so prior to his death was infected with COVID-19 and instead that Enock Benjamin's only exposure to COVID-19 occurred within the walls of the Souderton plant.  *Twombly*, 550 U.S. at 570.  But Plaintiff does not make that allegation, and no amount of discovery will eliminate the possibility that Enock Benjamin was infected by community spread.  Accordingly, all Plaintiff has alleged is the same sort of parallel conduct the United States Supreme Court found insufficient in *Twombly*, and the Complaint cannot satisfy the plausibility requirement of Rule 12(b)(6).  *See Twombly*, 550 U.S. at 570.  Therefore, the Court should dismiss all of Plaintiff's claims for lack of causation.

### 5. The Complaint fails to state a claim for negligence against any Defendant because it does not allege facts sufficient to show a breach of any existing duty.

Plaintiff's negligence claim should be dismissed because Plaintiff has not alleged facts sufficient to satisfy the fundamental elements of his claim.  The prima facie elements for a negligence claim in Pennsylvania are: (1) a duty or obligation recognized by law; (2) a breach of

that duty; (3) a causal connection between the defendant's breach of the duty and the resulting

injury; and (4) actual loss or damage suffered by the plaintiff. *Cooper v. Frankford Health Care*

*Sys., Inc.*, 960 A.2d 134, 140 n.2 (Pa. Super. 2008). As demonstrated above, Plaintiff cannot

satisfy the causation element of his claim. In addition, Plaintiff does not allege facts showing

Defendants breached any duty of care owed to Enock Benjamin.

Plaintiff contends Defendants "owed a duty to all those working at the Plant, including

Enock Benjamin, a business invitee, to provide a reasonably safe work environment, free from

unreasonable and dangerous hazards." (Compl. ¶ 153.) But Plaintiff does not allege facts

showing that Defendants failed to provide a work environment free from *unreasonable* hazards.

On the contrary, Plaintiff admits COVID-19 is a novel coronavirus. (*Id.* at ¶ 13.) And several

months after COVID-19 was declared a global pandemic (and two months *after* Enock Benjamin

died), the CDC admits it is "still learning about how the virus spreads and the severity of illness

it causes." *See* CDC, "Coronavirus Disease 2019 (COVID-19): How It Spreads," (last visited

June 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-

spreads.html. Considering these uncertainties, Defendants cannot be held liable for negligence.

This is not a garden-variety negligence action, wherein a defendant could foresee potential

injury from a known risk and failed to prevent the injury. Instead, Plaintiff contends Defendants

should have done more to protect Enock Benjamin from an invisible, novel threat about which

little was known and regarding which a great deal of conflicting guidance was offered within the

space of a few weeks. For example, throughout March 2020, federal organizations and officials

advised against the use of face masks for anyone other than healthcare providers in direct contact

with sick individuals. (*See* Ex. F, "CDC Interim Guidance for Businesses and Employers to Plan

and Respond to Coronavirus Disease 2019 (COVID-19), February 2020" (masks are not

mentioned among the recommendations) (Feb. 26, 2020); Ex. G, CDC (@CDCgov), TWITTER (Feb. 27, 2020, 4:00 PM), https://twitter.com/CDCgov/status/1233134710638825473; Ex. H, U.S. Surgeon General (@Surgeon_General), TWITTER (Feb. 29, 2020, 8:08 AM), https://twitter.com/Surgeon_General/ status/1233725785283932160.)  Not until April 3, 2020 did the CDC update its guidance to recommend that healthy individuals wear cloth face coverings.[6] *See* CDC, "Recommendations for Cloth Face Covers," (last visited June 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html (dated Apr. 3, 2020) ("CDC Mask Recommendation").  The CDC changed its recommendation on April 3, 2020 based on "recent studies." *Id.*  Even then, however, the CDC said the general public should not wear "surgical masks or N-95 respirators" because those are "critical supplies that must continue to be reserved for healthcare workers and other medical first responders, as recommended by current CDC guidance." *Id.*

Even after the CDC changed its position, the World Health Organization provided a conflicting message.  Unlike the CDC, the WHO's guidance continued to state "there is currently no evidence that wearing a mask (whether medical or other types) by healthy persons in the wider community setting, including universal community masking, can prevent them from infection with respiratory viruses, including COVID-19."  *See* World Health Organization, "Advice on the use of masks in the context of COVID-19:  Interim Guidance," ("Apr. 6, 2020 WHO COVID-19 Guidance") at p. 1 (last visited June 16, 2020),  https://apps.who.int/iris/bitstream/handle/ 10665/331693/WHO-2019-nCov-IPC_Masks-2020.3-eng.pdf (dated Apr. 6, 2020).

---

[6]  The Court may take judicial notice of the CDC's recommendations in accordance with Federal Rule of Evidence 201(b).

The WHO and CDC did agree on one point—medical masks and respirators should be reserved for healthcare workers. *Id.* at pp. 1–2. And in Pennsylvania, the availability of PPE, such as surgical masks, remained critically low through April 2020. On April 8, 2020, Pennsylvania's Governor issued an Executive Order authorizing state agencies to commandeer PPE within the Commonwealth for use by hospitals and other healthcare facilities treating patients with COVID-19. *See* Pa. Gov. Wolf Exec. Order, "Order of the Governor of the Commonwealth of Pennsylvania to Ensure the Efficient Allocation and Effective Use of Critical Medical Resources," (last visited June 16, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04 /20200408-GOV-Critical-Medical-Resources-Order.pdf (dated Apr. 8, 2020). All of these measures directly contradict Plaintiff's assertion that Defendants breached their duty of care to Enock Benjamin by failing to "offer surgical masks or respirators to workers who could be infected with COVID-19."[7] (Compl. ¶ 25.)

Plaintiff also alleges Defendants breached their duty of care by failing to close the JBS Souderton plant. Again, this allegation conflicts with the federal and state guidelines. On March 19, 2020, Pennsylvania ordered that life-sustaining businesses, including food processors, could remain open. The same day, the Cybersecurity & Infrastructure Security Agency of the U.S. Department of Homeland Security identified food processors, such as Defendants, as "critical infrastructure" with a "special responsibility" to continue normal operations. (*See* Ex. I, U.S. Dept. of Homeland Security, Cybersecurity & Infrastructure Security Agency, "Memorandum on

---

[7] Plaintiff falsely claims OSHA's guidelines recommended "that companies should offer surgical masks or respirators to workers who could be infected with COVID-19, especially those that worked in close quarters." (Compl. ¶ 25.) But the picture of the OSHA COVID-19 Guidance directly beneath Plaintiff's allegation shows OSHA did *not* recommend companies to provide surgical masks or respirators. (*See id.*) Instead, the OSHA COVID-19 Guidance notes that the "'types of PPE required during a COVID-19 outbreak will be based on the risk of being infected with SARS-CoV-2 while working and job tasks that may lead to exposure.'" (*Id.*) The OSHA COVID-19 Guidance also states, "Employers should check the OSHA and CDC websites regularly for updates about recommended PPE." OSHA COVID-19 Guidance at 14. And, as noted above, the CDC website specifically said surgical masks and respirators should be reserved for healthcare workers.

Identification of Essential Critical Infrastructure Workers During COVID-19 Response" (Mar. 19, 2020).)  And on April 28, 2020, President Trump invoked the Defense Production Act, thereby mandating that plants such as JBS Souderton remain open.  In short, these mandates contradict Plaintiff's assertion that Defendants breached their duty of care to Enock Benjamin by not closing the JBS Souderton plant.

Because COVID-19 is a new, pandemic disease and the scientific community still knows very little about its transmissibility, prevention, and treatment, the Court should reject Plaintiff's assertion that Defendants breached their duty of care by failing to provide surgical or N-95 respirators or by failing to close the Souderton plant.  Accordingly, Plaintiff's negligence claim is not viable and should be dismissed with prejudice.

**6.      Plaintiff's requests for punitive damages should be dismissed.**

Plaintiff's prayers for relief in each cause of action include requests for punitive damages. (*See* Compl. at pp. 25-26 and 30-32 (prayer for relief for Counts I-V).)  The Court should deny Plaintiff's punitive damages requests because the request for punitive damages (1) is preempted by federal law and (2) fails under Pennsylvania law.

**a.      Plaintiff's claim for punitive damages is preempted under federal law.**

With his demand for punitive damages, Plaintiff asks that Pennsylvania tort law be used to punish and deter the allegedly wrongful operations of a meat processing business during the COVID-19 pandemic.  But Pennsylvania law must yield in these circumstances to federal regulations, which govern the specific conduct at issue and displace the regime of sanctions Plaintiff seeks to invoke.

As the Court is aware, preemption of state law may arise in a variety of circumstances— *e.g.*, as a result of an express statutory command, or when state and federal law conflict and it would be impossible for a party to comply with both sets of requirements.  *See Crosby v. Nat'l*

*Foreign Trade Council*, 530 U.S. 363, 372–73 (2000).  State law is also preempted where it intrudes on an area exclusively regulated by the federal government.  *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (observing that federal preemptive intent may be inferred from "a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject").

This rule covers not only those regulations enshrined in positive law enacted by state legislatures, but to common law claims as well.  *See Shields v. Gen. Elec. Co.*, No. 18-cv-2421, 2020 WL 108618, at *4 (E.D. Pa. Jan. 9, 2020) (personal injury negligence claim preempted). Accordingly, courts routinely find that particular causes of action as well as particular remedies have been preempted when they intrude on the federal government's sphere of exclusive authority.[8]  Most relevant for present purposes is the courts' treatment of punitive damages, which function as "private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974); *see also Gingold v. Audi-NSU-Auto Union, A.G.*, 567 A.2d 312, 322 (Pa. Super. 1989) ("the crucial distinction between compensatory and punitive damages is that the purpose of punitive damages is to regulate safety, whereas the purpose of compensatory damages is to compensate victims.").[9]

Thus, courts have found punitive damages preempted where their imposition would operate as a *state* regulating—*i.e.*, punishing, terminating, and/or deterring—conduct that is subject only

---

[8]  *See, e.g.*, *Kurns v. R.R. Friction Prod. Corp.*, 565 U.S. 625, 637 (2012) (finding all common-law claims regarding locomotive equipment preempted by the Locomotive Inspection Act); *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 228 (1995) (Consumer Fraud Act claims preempted by the Airline Deregulation Act); *Ford v. UNUM Life Ins. Co. of Am.*, 351 Fed. App'x 703, 706 (3d Cir. 2009) (state law claims for breach of contract and negligence preempted under ERISA).

[9]  *Gingold* was overruled on other grounds by *Cellucci v. Gen. Motors Corp.*, 676 A.2d 253 (Pa. Super. 1996), which expanded the holding of *Gingold* to find all state tort claims preempted under the Motor Vehicle Safety Act, not just punitive damages.

to *federal* control.  *See, e.g.*, *McDarby v. Merck & Co.*, 949 A.2d 223, 272–75 (N.J. App. Div. 2008) (recognized in *Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 602, 638–39 (E.D. Pa. 2008)); *West v. Nw. Airlines, Inc.*, 995 F.2d 148, 152 (9th Cir. 1993).  In *McDarby*, for example, the New Jersey Superior Court found a plaintiff's claim for punitive damages preempted because it impinged on the ability of the Food and Drug Administration ("FDA") to enforce its own rules, invoking the doctrine of implied preemption established in *Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).  *McDarby*, 949 A.2d at 276 ("[P]olicing fraud on the FDA through a tort action could interfere with how the FDA might wish to police that kind of fraud itself." (emphasis removed) (citation omitted)); *see also Zimmerman v. Novartis Pharm. Corp.*, 889 F. Supp. 2d 757, 772 (D. Md. 2012) (punitive damages claim equivalent to the fraud-on-the-FDA claim that was preempted in *Buckman* "because they present the same conflict with the FDA's regulatory scheme and enforcement prerogatives").

Plaintiff's demand for punitive damages is preempted here pursuant to the President Trump's invocation of the Defense Production Act in the Food Supply Chain Order, 85 Fed. Reg. 26313.  (*See* ECF 1 [Notice of Removal] at ¶¶ 63–69.)[10]

As even a casual review of the Complaint makes clear, each of Plaintiff's claims seeks to have this Court impose punitive damages on Defendants in connection with various decisions they supposedly made (or neglected to make) in order to operate a meat processing facility during the presidentially declared COVID-19 emergency.  (*See, e.g.*, Compl. ¶¶ 7, 36, 154-56.)  The Food Supply Chain Order, however, does not permit such state-law second-guessing, in that it empowers the United States Department of Agriculture to "take all appropriate action" under the Defense

---

[10]  As the Supreme Court has explained, federal regulations such as the Food Supply Chain Order have the same preemptive effect as federal statutes.  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982).

Production Act to "ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." 85 Fed. Reg. 26313, 26313. In turn, the Defense Production Act grants the federal government exclusive authority to enforce violations of "any rule, regulation, order, or subpena[11] thereunder," and control "all litigation" arising under the statute or attendant regulations. 50 U.S.C. § 4556(b).

Punitive damages premised on Defendants' alleged failure to mitigate the risk of COVID-19 transmission at a meat processing plant would unavoidably impinge on the Department of Agriculture's explicit authority to regulate this conduct, and would threaten the fulfillment of its mandate to "ensure that meat and poultry processors continue operations." 85 Fed. Reg. 26313, 26313. As the Third Circuit explained, when a federal agency is required to strike a balance between competing objectives, a "uniform and exclusive" application of federal regulation is essential to effectuating Congressional intent. *Farina v. Nokia Inc.*, 625 F.3d 97, 123 (3d Cir. 2010) ("When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives. Allowing state law to impose a different standard permits a re-balancing of those considerations"). Or, to put it in the parlance used in *Buckman*, allowing state-law regulation (here, punitive damages) would "skew" the federal government's ability to achieve its desired balance between (1) ensuring the safe operation of domestic meat processing facilities; and (2) protecting the integrity of the nation's food supply. *See Buckman*, 531 U.S. at 348.

---

[11] The statute uses the archaic spelling of subpoena, which was "the spelling recommended by the *Government Printing Office Style Manual*" until 1986. Brian A. Garner, *Garner's Modern American Usage: The Authority on Grammar, Usage, and Style* 782 (3d ed. 2009).

In the face of this conflict, the federal interest in regulating the imposition of punitive damages against a manufacturer complying with the Defense Production Act "overrid[es]" a given state's interest in regulating a company within its borders. *In re Agent Orange Prod. Liab. Litig.*, 580 F. Supp. 690, 705-06 (E.D.N.Y. 1984) (finding federal law, not state law, would apply to punitive damages sought by personal injury plaintiffs). Supremacy of the federal interest serves the national defense in a time of crisis because it ensures the continued supply of vital materials—in this case, the nation's food supply. *Id.* at 706 ("The federal government is interested in the defense contractors' continued willingness and ability to supply material vitally needed for the national defense.").

Finally, a specifically articulated federal interest under the Defense Production Act will prevail over a broader interest raised by a state common-law claim, even if the two have generally parallel objectives. *See In re Agent Orange*, 580 F. Supp. at 704 ("As opposed to the general policy behind products liability which encompasses all those injured by defective products, there is a far more specific federal policy of ensuring compensation for injured members and veterans of the armed forces."); *id.* at 706 (applying federal law to punitive damages where "the federal government's interest . . . is demonstrably greater and more specific than the interest of any individual state.").

Although Pennsylvania may generally impose punitive damages on landowners who permit unsafe conditions—or even, as Plaintiff alleges, intentional tortfeasors—the federal government's specifically articulated rules for the operation of meat processing facilities during the COVID-19 pandemic outweighs and displaces the Commonwealth's interest. Accordingly, Plaintiff's claim for punitive damages is preempted by federal law and should be dismissed.

> **b.     To the extent Plaintiff's request for punitive damages is not preempted, it nevertheless fails under Pennsylvania law.**

Plaintiff's requests for punitive damages should be stricken under Pennsylvania law because Plaintiff has not alleged, and cannot prove, facts demonstrating Defendants' actions or inactions in the first weeks of a developing national emergency and global pandemic constitute outrageous conduct.  In addition, punitive damages are not available in a wrongful death cause of action.  *See, e.g.*, *Harvey v. Hassinger*, 461 A.2d 814, 815-16 (Pa. Super. 1983) (citing *Pa. R.R. Co. v. Vandever*, 36 Pa. 298, 304 (1860)).

Punitive damages are awarded in addition to compensatory damages to "punish a tortfeasor for outrageous conduct and to deter him or others like him from similar conduct."  *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005).  They "are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct."  *Id.*  In Pennsylvania, a plaintiff seeking punitive damages must demonstrate that a defendant had both a subjective appreciation of the risk of harm and that he acted or failed to act in conscious disregard of that risk.  *Id.* at 772.  Merely alleging that the actions taken by a defendant violated state and federal laws without also alleging subjective awareness that the law was being violated and conscious disregard is not sufficient to support a punitive damages award.  *See, e.g.*, *Carson v. Tucker*, No. 5:20-cv-00399, 2020 WL 1953655, at *7-8 (E.D. Pa. Apr. 23, 2020).

Plaintiff's allegations do not meet these standards.  In seeking to support his demand, Plaintiff places overwhelming weight on Defendants' supposed failure to "obtain masks or other PPE for their workers until April 2, 2020" and "refus[al] to close their plants or otherwise limit the number of workers reporting for duty each day," (Compl. ¶¶ 26, 60).  Missing from Plaintiff's narrative, however, is any allegation that Defendants possessed actual subjective knowledge of the

presence of even a positive case of COVID-19 within the Souderton facility prior to Enock Benjamin's final day of work on March 27, 2020.  Indeed, the most Plaintiff can say is that, "[b]ased upon information and belief, by early March the virus was firmly established in the Souderton plant."  (*Id.* at ¶ 57.)  But even taking as true the assertion that COVID-19 was *present* in the Souderton plant in early March 2020, that fact does nothing to show Defendants were *subjectively aware* of an active infection within the plant at that time or that they acted with conscious disregard for the risk of infection to employees.  On the contrary, Plaintiff's own allegations show that JBS Souderton did not know any employee tested positive for COVID-19 until late March and that it sent a letter to employees notifying them of that fact.  (Compl. ¶ 64; *see also id.* at ¶ 71 (only four or five confirmed COVID-19 cases as of March 30, 2020).)

Nor has Plaintiff pleaded facts showing that the mitigation steps taken by Defendants in March 2020 reflect an outrageous disregard for known risks of COVID-19 transmission.  For example, Plaintiff faults Defendants for not providing surgical masks or respirators to all JBS Souderton workers.  (Compl. ¶¶ 25–27.)  Yet, Plaintiff ignores the fact that, even according to the federal guidance he relies on in his Complaint, providing masks (or other PPE) was considered the least-effective mechanism for protecting employees from workplace transmission of COVID-19.  (*See* OSHA COVID-19 Guidance at 14 ("engineering and administrative controls are considered more effective in minimizing exposure to SARS-CoV-2" than providing PPE); *see also* Apr. 6, 2020 WHO COVID-19 Guidance ("However, there is currently no evidence that wearing a mask (whether medical or other types) by healthy persons in the wider community setting, including universal community masking, can prevent them from infection with respiratory viruses, including COVID-19.").)

Plaintiff's mask-centric allegations also overlook that the relevant federal guidance says (1) workers in medium-risk environments (such as meat processing plants) "*may* need to wear" PPE, and (2) the specific mix of PPE appropriate for a particular employee might vary based on the nature of the tasks being performed—*i.e.*, there is no one-size-fits-all solution to the question of how employers should deploy PPE within their facilities.  (OSHA COVID-19 Guidance at 22 (emphasis added).)  Such an inference is particularly implausible, given that contemporaneous public health guidance recommended that respirators and surgical masks be reserved for healthcare and other front-line workers.  (*See, e.g.*, Ex. H, U.S. Surgeon General (@Surgeon_General), Twitter (Feb. 29, 2020, 8:08 AM), https://twitter.com/Surgeon_General/status/1233725785283932160 ("Seriously people – STOP BUYING MASKS!  They are NOT effective in preventing general public from catching #Coronavirus, but if healthcare providers can't get them to care for sick patients, it puts them and our communities at risk!"); Ex. J, U.S. Surgeon General (@Surgeon_General), Twitter (Mar. 28, 2020, 5:55 PM), https://twitter.com/ Surgeon_General/status/1244020292365815809 ("1/3 Regarding masks: @WHO @CDCgov & my office have consistently recommended against the general public wearing masks as there is scant or conflicting evidence they benefit individual wearers in a meaningful way, but real concerns about pulling from the healthcare worker supply. . .").)  And, as noted above, the CDC did not recommend the general public use cloth face coverings until April 3, 2020.  *See* CDC Mask Recommendation, *supra*.  In any event, the alleged failure to meet these guidelines—or exceed them as Plaintiff demands—is insufficient to support a punitive damages award.  *Carson*, 2020 WL 1953655, at *7–8.

Plaintiff's demand for punitive damages also falls short because Plaintiff:  (1) fails to allege facts showing that the non-provision of masks before Enock Benjamin's last day at the Souderton

facility, March 27, 2020, was the result of a reckless, willful, or wanton disregard for employees' well-being; (2) omits any reference to what PPE aside from masks JBS Souderton's employees were provided; and (3) neglects to supply any factual context that would render JBS Souderton's alleged conduct of not providing masks outrageous in the particular circumstances of the Souderton facility.  Moreover, Plaintiff acknowledges that Defendants closed the plant on March 30, 2020, "out of an abundance of caution" when there were only "four or five" confirmed COVID-19 cases among hourly employees.  (Compl. at ¶¶ 70–72.)  These allegations alone demonstrate that JBS Souderton reacted to the COVID-19 threat appropriately and thus fatally contradict Plaintiff's request for punitive damages.

In sum, Defendants' actions or alleged inactions in the early weeks of a global pandemic, national medical emergency, and threatened food shortage, do not warrant punitive damages.  Even when read in the light most favorable to Plaintiff, the Complaint's allegations do not show that Defendants' conduct was outrageous and in conscious disregard of the known risks at that time. Accordingly, any request for punitive damages should be stricken.

**C.**     **The Court should dismiss Plaintiff's fraud claims because Plaintiff failed to plead the claims with particularity.**

Under Rule 9(b), "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200.  Plaintiff's claims for fraudulent and intentional misrepresentation are subject to this heightened pleading standard.  *See*

*Travelers Indem. Co. v. Cephalon, Inc.*, 620 F. App'x 82, 85 n.3 (3d Cir. 2015) ("all of Plaintiffs' claims alleging fraudulent activity—i.e., Plaintiffs' claims for intentional and negligent misrepresentation, unjust enrichment and an injunction—must be pled with sufficient particularity under Rule 9(b)").  But Plaintiff does not provide the particularity required by Rule 9(b).

Plaintiff's assertions regarding fraudulent and intentional misrepresentations are mere vague allegations that misrepresentations were made without any details about when or where the representations were supposedly made.  (*See* Compl. ¶¶ 162–67, 170.)  Plaintiff also fails to identify who allegedly made the representations and who received the representations.  (*Id.*); *Travelers*, 620 F. App'x at 86 ("'Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation.'").

Plaintiff's lack of specificity is not surprising because Plaintiff's true assertion is that "JBS intentionally misrepresented the safety of the facility" by simply "keeping the Souderton plant open."  (Compl. ¶ 11.)   In other words, Plaintiff's claims for fraudulent and intentional misrepresentation are not based on any actual false statements made by any individual employed by any Defendant to Enock Benjamin or anyone else at the Souderton facility, but are instead based on the fact that JBS Souderton did not completely shut down the Souderton plant before Enock Benjamin's final day, March 27, 2020.

Because the "complaint does not describe any representations whatsoever" or "disclose the identity of the person who made the allegedly fraudulent misrepresentations," Plaintiff's claims for fraudulent and intentional misrepresentations should be dismissed pursuant to Rule 9(b). *DiMare v. MetLife Ins. Co.*, 369 F. App'x 324, 330 (3d Cir. 2010).

## IV.   CONCLUSION

For all the reasons set forth above, Plaintiff's Complaint should be dismissed with prejudice.  Defendants also request all other and further relief to which they are entitled at law or in equity.

Dated: June 16, 2020

Respectfully submitted,

*/s/ Molly E. Flynn*
Molly E. Flynn (Pa. ID No. 205593)
Mark D. Taticchi (Pa. ID No. 323436)
Rebecca L. Trela (Pa. ID No. 313555)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103-6996
Telephone:     (215) 988-2700
Facsimile:     (215) 988-2757

*Attorneys for Defendants JBS USA Food Co.,*
*JBS USA Holdings, Inc., JBS Souderton, Inc.,*
*and Pilgrim's Pride Corp.*

43

## <u>CERTIFICATE OF SERVICE</u>

I, Molly E. Flynn, hereby certify that on June 16, 2020, I electronically filed the foregoing Motion to Dismiss and Memorandum of Law in Support of Motion to Dismiss of Defendants JBS USA Food Company, JBS USA Holdings, Inc., JBS Souderton, Inc., and Pilgrim's Pride Corporation Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel or parties of record electronically by CM/ECF.

*/s/ Molly E. Flynn*
Molly E. Flynn

*Attorney for Defendants JBS USA Food Co.,*
*JBS USA Holdings, Inc., JBS Souderton,*
*Inc., and Pilgrim's Pride Corp.*