**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FERDINAND BENJAMIN**, Individually and as the Personal Representative of the **ESTATE OF ENOCK BENJAMIN**, deceased, | : : : : | **CIVIL ACTION** |
| | : | |
| *Plaintiff*, | : | |
| v. | : | |
| | : | **No.    2:20-cv-2594-JP** |
| **JBS S.A.**, | : | |
| **JBS USA FOOD COMPANY**, | : | |
| **JBS USA HOLDINGS, INC.**, | : | |
| **JBS SOUDERTON, INC.**, and | : | |
| **PILGRIM'S PRIDE CORPORATION**, | : | |
| | : | |
| *Defendants*. | : | |

**REPLY BRIEF IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR REMAND**

**SALTZ MONGELUZZI & BENDESKY P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
(215) 496-8282

ROBERT J. MONGELUZZI (ID No. 36283)
STEVEN G. WIGRIZER (ID No. 30369)
JEFFREY P. GOODMAN (ID No. 309433)
JASON S. WEISS (ID No. 310446)

*Attorneys for Plaintiff, Ferdinand Benjamin,*
*individually and as the Personal Representative of*
*The Estate of Enock Benjamin, deceased*

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………..…………………………..     i

TABLE OF AUTHORITIES…………………………...……………….....…     ii

INTRODUCTION…………..…………………………….....…………….....  1

A.   The Declaration of Matthew Lovell fails to prove JBS Souderton, Inc. was fraudulently joined……………………………...…………... 3

B.   Attorney Meyers' declaration fails to prove that JBS Souderton, Inc. was fraudulently joined to this action …………………….…….. 7

C.   Any Argument that Plaintiff's Complaint fails to sufficiently plead facts to satisfy the <u>Martin</u> exception to Workers' Compensation immunity amounts to nothing more than unsupported conjecture…………...……….. 9

D.   This Court should not assert federal question jurisdiction as JBS's continued reliance on <u>Grable</u> strains credibility………...………...……... 13

i.   Factor 1: Plaintiff's Complaint does not raise a federal question…... 15

ii.   Factor 2: There is no actual dispute as to a federal regulation……….. 17

iii.   Factor 3: OSHA and CDC guidelines do not raise a substantial question of federal law..………...………………………….……….. 17

iv.   Factor 4: If this Court retained jurisdiction, it would disrupt the federal-state court balance.…………………………………….....  18

CONCLUSION………………………………………………………...………. 19

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abington Twp. v. Crown Castle NG East LLC*, 2017 WL 57142 (E.D. Pa. Jan. 5, 2017) ……. 18

*Ahmad v. Alcoa, Inc.,* 2009 WL 10672159, at*3-4 (C.D. Cal. Jan. 27, 2009) ………………. 16

*Ali v. DLG Development Corp.*, 283 F. Supp. 3d 347, 354 (E.D. Pa. 2017) ………………..  18

*Batoff v. State Farm Ins. Co.,* 977 F.2d 848 (3d Cir. 1992)………………..……….........….. 9

*Blankenship v. Bridgestone Am. Holding, Inc.*, 467 F. Supp. 2d 886 (C.D. Ill. 2006) ……….. 16

*Boyer v. Snap–On Tools Corp.,* 913 F.2d 108 (3d Cir.1990)……………..…...…………….. 9, 19

*Brown v. Francis,* 75 F.3d 860, 865 (3d Cir. 1996) ……………………….…..……………. 19

*Conklin v. Moran Industries, Inc.*, 2011 WL 2135647 (E.D. Pa. May 31, 2011) ……...……. 18

*Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816-17 (4th Cir. 2004) …………………..……. 16

*Empire HealthChoice Assur., Inc. v. McVeigh*, 547 U.S. 677 (2006) ……………………..passim

*Glanton v. Harrah's Ent., Inc.*, 297 F. App'x 685 (9th Cir. 2008) …………………………. 16

*Goforth v. Nevada Power Co.*, 101 F. Supp. 3d 975 (D. Nev. 2015) ……………..……. 15, 16, 17

*Grable & Sons Metal Products, Inc. v. Darue Eng. & Man.*, 545 U.S. 308 (2005)………. passim

*Gunn v. Minton*, 568 U.S. 251 (2013) ……………………………………………………… 14, 15

*Manning v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 772 F.3d 158 (3d Cir. 2014) ………... 16

*Martin v. Lancaster Battery Co.*, 606 A.2d 444 (Pa. 1991) …………….…………….. 3, 9, 10, 12

*McGuire v. Palmerton Hosp.*, 2012 WL 2362488 (E.D. Pa. June 20, 2012) …………………. 17

*McLaughlin v. Bayer Essure, Inc.*, 2018 WL 3535142 (E.D. Pa. July 23 2018) ……….……. 18

*Rains v. Criterion Sys., Inc.*, 80 F.3d 339 (9th Cir. 1996) ………………………….……… 16

*Samuel-Bassett v. KIA Motors Am., Inc.,* 357 F.3d 392 (3d Cir. 2004) …………………..……. 3

*Steel Valley Auth. v. Union Switch & Signal Div.,* 809 F.2d 1006 (3d Cir. 1987) ………….. 1, 19

*U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383 (3d Cir. 2001) ………………….……..…. 17

*Yellen v. Teledne Cont'l Motors, Inc.*, 832 F. Supp. 2d 490 (E.D. Pa. 2011) ……………..…… 15

## **Other Authorities**

16 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 107.05 (3d ed. 2003) ………....... 19

*Pa. SSJI (Civ.) 13.110*……………………………….………..…………………………… 15

**INTRODUCTION.**

JBS's opposition to Plaintiff's Motion to Remand reveals one of the following two statements *must be true*: (1) Due to the complex corporate shell game that JBS operates, it is currently impossible to determine which entity was Enock Benjamin's employer; or, in the alternative; (2) As a result of comprehensive organizational failures, JBS has consistently filed inaccurate governmental documents which misidentify the employer of their own workers. In either event, this matter must be remanded because JBS has failed in its attempt to establish that Plaintiff fraudulently joined JBS Souderton, Inc.  Steel Valley Auth. v. Union Switch & Signal Div., 809 F.2d 1006, 1010 (3d Cir. 1987) ("the removal statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand.").

In their opposition, JBS attaches a variety of declarations and documents which only further supports that there are genuine issues of material fact as to who was the employer of Enock Benjamin. JBS's opposition continues to rely on the assertion that JBS USA Holdings, Inc. no longer exists. However, JBS provides no explanation whatsoever as to why, *before June 19, 2020*, *every* individual who was injured at Souderton *had their employer* listed as "JBS USA Holdings, Inc." on his or her governmental filings. (See Doc. No. 17 at Ex. A, Ex. B., Ex. C, Ex. D.) Similarly, JBS's opposition provides no explanation as to why the Federal EIN number that was used to submit Workers Compensation claim denials *before June 19, 2020* are attached to an entity that *presently* does business as, or in the alternative, is known as, JBS USA Holdings, Inc. (See Doc. No. 17 at Ex. I.) These issues of fact were created by JBS and the manner in which the chose to conduct their business. It is entirely inappropriate for them now to ask this Court at this preliminary stage to resolve these issues in their favor and in doing so deny Plaintiff his validly chosen forum.

JBS provides no explanation as to why the federal government sent warning letters to *JBS USA Holdings, Inc*. for violations of the Federal Food, Drug, and Cosmetic Act at the Souderton facility in *April 2019*:

Tuesday, April 23rd, 2019

JBS USA Holdings, Inc.
Mr. Andre Nogueira, President & CEO
1770 Promontory Circle
Greeley, Colorado  80634

**WARNING LETTER**
CMS: 574386

Dear Mr. Nogueira:

On March 13th and 14th, March 19th, March 30th, August 6th, and October 17th, 2018, the U.S. Food and Drug Administration (FDA or "we") conducted an inspection of your rendering plant, JBS Souderton, Inc dba MOPAC, located at 741 Souder Road, Souderton, Pennsylvania, 18964. The inspection was a joint effort with the Pennsylvania Department of Agriculture (PDA), which inspected your plant on several days between March 13th and June 6th, 2018. Your rendering plant produces animal food ingredients distributed to animal food manufacturers. This letter notifies you of the significant violations of the Federal Food, Drug, and Cosmetic Act (the Act) that we found during our inspection of your operation and listed in the Form FDA 483 issued to you at the conclusion of the inspection.

[1]

JBS's opposition provides no explanation as to why CEO Andre Noguiera was quoted in the Wall Street Journal *on May 15, 2020 as the CEO for JBS USA Holdings, Inc.*:

> JBS USA Holdings Inc., which slaughters 23% of the country's cattle and produces nearly one-fifth of its pork, is revamping plant operations to space workers farther apart while about 10% of its workforce has been sent home because of their higher risk from Covid-19, Chief Executive Andre Nogueira said.
>
> "We will not be able to go to full capacity anytime soon as we fight this virus because of all the changes we have implemented," Mr. Nogueira said in an interview.
>
> [2]

These issues are entirely unaddressed in JBS's opposition and *the silence is deafening*.

---

[1]      This document was attached as an exhibit to Plaintiff's Opposition to JBS's Motion to Dismiss which was filed July 6, 2020 – one week prior to JBS's responsive pleading to this motion.  (See Doc. No. 20 at Ex. A.)

[2]      This document was attached as an exhibit to Plaintiff's Opposition to JBS's Motion to dismiss which was filed July 6, 2020 – one week prior to JBS's responsive pleading to this motion.  (See Doc. No. 20 at Ex. B.)

Instead, the exhibits attached to JBS' responsive filing illustrate why Plaintiff's Motion to Remand is warranted. By attaching self-serving declarations with only carefully selected portions of documents annexed, JBS continues to add to the pile of disputed facts. By only submitting selected portions of documents like a collective bargaining agreement, JBS has unilaterally undermined its own desired result. Given that these disputes must be viewed in a light most favorable to Plaintiff, self-serving submissions that raised more questions than further indicate that remand is appropriate. In short, JBS cannot come close to satisfying its' burden for removal. Samuel-Bassett v. KIA Motors Am., Inc., 357 F.3d 392, 396 (3d Cir. 2004).

Further, JBS' arguments related to the exception to Workers' Compensation immunity created in Martin v. Lancaster Battery Co., 606 A.2d 444, 447-48 (Pa. 1991) are matched in futility only by JBS's continued inappropriate reliance on Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing, 545 U.S. 308 (2005).

For these reasons, and all that follow, this matter should be remanded to the Court of Common Pleas of Philadelphia County.

### A. The Declaration of Matthew Lovell fails to prove JBS Souderton, Inc. was fraudulently joined.

JBS has proffered the declaration of Matthew Lovell in an attempt to prove that JBS Souderton, Inc. was Mr. Benjamin's employer (and thus fraudulently joined). Instead, Mr. Lovell's declaration raises additional questions related to the continued existence of JBS USA Holdings, Inc., as well as, the role of JBS USA Food Company, while resolving none of the factual disputes.

Mr. Lovell's declaration states that he "served as JBS Souderton's Inc.'s lead labor negotiator with the United Food and Commercial Workers Union Local 1776 Keystone State, the authorized representative of non-management employees of JBS Souderton, Inc. who work at the

Plant." (See Doc. No. 21 at Ex. H at ¶ 3.) What Mr. Lovell's declaration is **silent** on is *which entity is his employer*. This omission is *glaring* under the circumstances. However, Mr. Lovell's declaration was executed in Greeley, Colorado. (Id. at ¶ 21.) As this court is aware, there are two JBS entities in this lawsuit located there: (1) JBS USA Food Company and (2) JBS USA Holdings, Inc.

By comparison, JBS Souderton, Inc. is not located in Colorado, it is located in Pennsylvania. The fact that JBS could not find a single person from JBS Souderton, Inc. to even comment on the Collective Bargaining Agreement establishes their control of the employment and collective bargaining environment and further reinforces that there are genuine issues of material fact as to what workers, supervisors, and management personnel were employed by which JBS entity.

Mr. Lovell's LinkedIn Profile merely lists his employer as "JBS USA." (See *Lovell LinkedIn*, attached hereto as "Ex. A-1.") Meanwhile, other publicly available sources list Mr. Lovell's employer as "JBS USA Holdings, Inc.":



(See *Lovell Public Listing 1*, attached hereto as "Ex. A-2.")



(See *Lovell Public Listing 2*, attached hereto as "Ex. A-3.")

Moreover, Mr. Lovell's declaration contains *only selected portions* of the Collective Bargaining Agreements referred to in that document. Recently, Mr. Lovell has publicly commented on similar agreements with JBS plants in other domestic locations. For example, Mr. Lovell recently admonished a Colorado Union for filing a public grievance about the lack of safety precautions JBS was providing at that facility:

"In particular, it seems the Local has adopted a strategy of generating negative media attention and public opinion in an effort to unwind agreements made in the CBA and gain concessions from the Company as they relate to employee safety," Matthew Lovell, JBS head of labor relations, wrote in the five-page letter. He wrote that the union was contractually obligated to address safety concerns through a grievance process and prohibited from taking actions outside of that process.

(See *Denver Post Article*, attached hereto as "Ex. A-4.")

That article also fails to assign an employer to Mr. Lovell. However, the Colorado Union **leaked** the letter that Mr. Lovell sent to the union that was referenced in the above quote. In that five (5) page letter, Mr. Lovell admonishes the union for publicly discussing COVID-related

5

safety issues at the Colorado facility – claiming that the safety of the facility and the employees

is *the exclusive responsibility of JBS USA Food Company*:

**Relevant Provisions of the CBA**

*Article 3 – Safety*

Article 3 provides that the Company "has the sole responsibility to provide a safe and healthy workplace and to correct safety and health hazards" and that "[n]othing in th[e] agreement shall imply that the Union has undertaken or assumed any portion of that responsibility." *Article 3, Section 1(A)*. Further, it was agreed that the "Company shall furnish all safety equipment necessary for the protection of hourly employees." *Article 3, Section 4*. Finally, the parties committed that disputes over the Company's compliance with this Article would be referred to grievance procedure. *Article 3, Section 6*.



If the Local believes the Company is not providing adequate PPE or should take other safety measures, its sole remedy is to file a grievance. In recognition of this exclusive remedy, on March 27, 2020, the Local filed a grievance alleging the "Company violated the CBA by failing to provide proper PPE and a safe workplace for its workers as a result of the COVID-19 pandemic." That grievance is pending, and the parties are processing it in the usual course. Under these circumstances, the Local is not permitted to engage in self-help, mobilization, or corporate campaign activities against the Company outside of the grievance process in an effort to compel the Company to take specific safety precautions that the Local has alone determined should be implemented.

(See *Lovell Letter*, attached hereto as "Ex. A-5" at 1-2.)

It is unclear what the Souderton CBA states about safety responsibilities for employees

because JBS *omitted* that portion of the document from its' submission to this Court. Regardless,

Mr. Lovell clearly stated that the safety of the employees is the responsibility of JBS USA Food

Company, as it relates to the Colorado facility. (Ex. Letter.)[3]

It is also unclear whether Mr. Lovell's employer is JBS USA Food Company, JBS USA

Holdings, Inc., or JBS Souderton, Inc. His declaration is inconsistent with publicly available

records and makes no definitive statement on the topic.

---

[3]     This omission was likely intentional as it would be ***devastating*** to the alter-ego argument unilaterally raised by JBS in its' Motion to Dismiss. (See Doc. No. 15 at pg. 13.)

As a logical consequence, it is *impossible* to know who Mr. Benjamin thought Mr. Lovell was representing, or to what extent Mr. Benjamin was involved with, the negotiations referred to in Mr. Lovell's declaration. Instead, JBS's thinly-veiled attempt to distract from its pattern and practice of listing JBS USA Holdings, Inc. as the employer of individuals that worked at the Souderton facility *prior to June 19, 2020* on government filings, raises serious issues of fact. Despite this striking lack of accountability, it is clear that these matters are appropriate for discovery and prevent JBS from meeting its burden.

Mr. Lovell's declaration does more harm than good for JBS's desired goal of proving that JBS Souderton, Inc. was Mr. Benjamin's employer.

### B.  Attorney Meyers' declaration fails to prove that JBS Souderton, Inc. was fraudulently joined to this action.

It is not surprising that JBS decided to shamelessly blame other entities instead of admitting that Enock Benjamin's initial denial of Workers' Compensation benefits properly listed his employer as JBS USA Holdings, Inc. (See Doc. No. 17 at Ex. A.) The audacity of submitting a declaration from an attorney *uninvolved with this case* that operates to *blame*: (a) Sedgwick – the third party administrator and (b) the data population system of Pennsylvania's Bureau of Workers Compensation, is blatant finger-pointing to distract the Court from a document that JBS knows ***destroys*** its diversity jurisdiction arguments.

The following glaring omissions from Attorney Meyers' declaration demonstrate that it should be given no weight:

- Attorney Meyers' declaration provides no explanation whatsoever as to why every individual, including Enock Benjamin, who suffered an injury at the Souderton facility *prior to the date JBS's Motion to Dismiss was filed in this lawsuit* was listed as an employee of JBS USA Holdings, Inc.

7

- Attorney Meyers' declaration does not state who at JBS Souderton, Inc. contacted him on June 19, 2020 about the *alleged* mistake.
- Attorney Meyers' declaration does not state how he knew that his communication about the June 15, 2020 denial letter was with a representative of JBS Souderton, Inc., as opposed to a different JBS entity, or in the alternative, an attorney who represents multiple parties to this litigation.
- Attorney Meyers' declaration provides no details as to the substance of the alleged conversation that occurred between JBS Souderton, Inc. and himself on June 19, 2020.
- Attorney Meyers' declaration provides no information as to how JBS Souderton, Inc. became aware that the June 15, 2020 denial letter listed JBS USA Holdings, Inc. as the employer of Enock Benjamin.
- Attorney Meyers' declaration provides no explanation as to why Sedgwick has been denying Workers' Compensation claims on behalf of JBS USA Holdings, Inc. for years, when JBS *allegedly* intended to dissolve that entity in 2015.
- Attorney Meyers' declaration provides no explanation as to why the Federal EIN number *that was used to deny all the claims*, including Enock Benjamin's, is still active and in existence if JBS USA Holdings, Inc. was dissolved in 2015. (See Doc. No. 17 at Ex. A; Ex. B; Ex. C; Ex. D; Ex. I.)
- Attorney Meyers' declaration fails to mention any investigation that he conducted as to Mr. Benjamin's employment status with co-defendants, JBS USA Holdings, Inc., JBS USA Food Company, JBS S.A., or Pilgrim's Pride Corporation.
- Attorney Meyers' declaration fails to mention whether, in addition to the legal responsibilities he alleges to have for JBS Souderton, Inc., he owes any legal responsibilities to co-defendants, JBS USA Holdings, Inc., JBS USA Food Company, JBS S.A., or Pilgrim's Pride Corporation.
- Attorney Meyers' declaration fails to address any conflict, perceived or otherwise, that the execution of his declaration creates in this case or other cases he has worked on which were *resolved*, *disputed, or paid* where JBS USA Holdings, Inc. was listed as the claimant's employer.

8

There are no indicia whatsoever that Attorney Meyers discovered the *alleged* mistake *on his own*. Instead, Attorney Meyers issued an Amended Notice of Denial *after* JBS filed a Notice of Removal and Motion to Dismiss that were *completely undermined* by JBS's original Notice of Denial.

Attorney Meyers' declaration confirms what was already suspected: JBS realized how meritless their diversity jurisdiction arguments were when the entity that was fighting Workers' Compensation claims for employees at the Souderton facility was *actually* Colorado based, JBS USA Holdings, Inc. That is why the Amended Denial was issued. But there is nothing about the Amended Denial, or Attorney Meyers' declaration, that changes the inescapable conclusion that a genuine issue of material facts exists as to which entity was Enock Benjamin's employer.

As previously set forth, the removal statutes are to be "***strictly construed against removal and all doubts should be resolved in favor of remand.***" Boyer v. Snap-on Tools, Corp., 913 F.2d 108, 111 (3d Cir. 1990); see also Batoff v. State Farm Ins. Co., 977 F.2d 848, 851, 854 (3d Cir. 1992) (emphasis added).

Accordingly, it would be unjust to deny remand based upon self-serving amendments to governmental filings and declarations.

> **C.    Any argument that Plaintiff's Complaint fails to sufficiently plead facts to satisfy the *Martin* exception to Workers' Compensation immunity amounts to nothing more than unsupported conjecture.**

There is a genuine issue of material fact as which entity is Enock Benjamin's employer. Although JBS has sought to blame othesr for a government filing listing Mr. Benjamin's employer as JBS USA Holdings, Inc. – that denial *is what was actually filed by JBS or on JBS's behalf*. This constitutes a binding admission, or at a minimum, a genuine issue of material fact.

However, after reasonable investigation, it is able to be determined that JBS Souderton, Inc. was Mr. Benjamin's employer, than Plaintiff's civil action still should be remanded. This is

9

because Plaintiffs' claims sounding in fraudulent and intentional misrepresentation are exceptions to any immunity. JBS continues to imprudently argue that Plaintiff's allegations fail to satisfy the exception to Workers' Compensation immunity set forth in <u>Martin v. Lancaster Battery Co.</u>, 606 A.2d 444 (Pa. 1991). Here is a portion of what JBS argues in its' opposition:

The facts of *Martin* illustrate both the rationale for, and the narrowness of, the exception. In *Martin*, the plaintiff-employee worked in a facility that used a manufacturing process which exposed workers to lead dust and fumes. *Martin v. Lancaster Battery Co.*, 606 A.2d 444, 444–45 (Pa. 1992). The defendant-employer performed blood tests on employees but intentionally withheld the results of the plaintiff's tests; if the employer had timely disclosed the results of those tests to the employee, the employee's chronic lead toxicity would not have been nearly as severe. *Id.* at 446. In seeking to avoid the PWCA's immunity bar, the employee asserted that his employer's "fraudulent misrepresentation" had "caus[ed] the delay which aggravated a work-related injury." *Id.* at 447. Importantly, the employee was "not seeking compensation for the work-related injury itself," but only for the exacerbation of that injury. *Id.* "There is a difference," the Court explained, between "employers who tolerate workplace conditions that will result in a certain number of injuries or illnesses and those who *actively* mislead employees *already suffering* as the victims of workplace hazards, thereby precluding such employees from limiting their contact with the hazard and from receiving prompt medical attention and care." *Id.* at 448 (emphasis added). Only the latter, the Court held, would be excepted from the PWCA. *Id.*

Plaintiff agrees with the highlighted section above. The exception only applies to employers that ***actively*** mislead employees ***already suffering*** as the victims of workplace hazards, thereby preventing employees from limiting their contact with the hazard. That is precisely what is being asserted in Plaintiff's Complaint. For example:

8.      Despite the known risks regarding COVID-19, prior to shutting down the plant on March 30, 2020, the JBS Defendants: (1) failed to provide sufficient personal protective equipment; (2) forced workers to work in close proximity; (3) forced workers to use cramped and crowded work areas, break areas, restrooms, and hallways; (4) discouraged workers from taking sick leave in a manner that had sick workers in fear of losing their jobs; and (5) failed to properly provide testing and monitoring for individuals who have may have been exposed to the virus that causes COVID-19.

9.      Instead, at the Souderton facility where Mr. Benjamin worked, JBS increased production during March 2020, adding a "Saturday Kill" to capitalize on increased demand caused by public panic purchases of ground meat.

10.      During this critical timeframe in March 2020, Mr. Benjamin contracted COVID-19 while working at JBS Souderton because the JBS Defendants inexplicably failed to take proper safety precautions to protect workers.

11.      By keeping the Souderton plant open without providing the proper and recommended safety precautions, JBS intentionally misrepresented the safety of the facility.

60.      Despite these known risks, the JBS Defendants refused to close their plants or otherwise limit the number of workers reporting for duty each day.

61.      Based upon information and belief, as of March 2020 many employees were led to believe that the individuals who were out sick had the flu, not COVID-19.

62.      Based upon information and belief, upon learning of the first positive COVID individual in the facility in early March 2020, JBS failed to change its policies and procedures.

63.      Based upon information belief, instead of implementing proper safety policies and procedures, due to increased business demands in March 2020, JBS Souderton added a "Saturday Kill" to meet increased demand in ground beef sales.

11

64.     Based upon information and belief, after the first positive COVID-19 result, JBS sent a letter to "Souderton Team Members" stating that "one of our team members has tested positive for COVID-19 after exhibiting flu-like symptoms."

65.     Based upon information and belief, the only employees who were given off work after this test were "team members who were in direct contact with the individual for extended periods of time."

66.     Based upon information and belief, after the first positive COVID-19 result, JBS Souderton team members were informed that "Our Souderton facility will remain open."

79.     Based upon information and belief, the JBS Defendants had a 'work while sick' policy.

80.     The JBS Defendants did not require workers experiencing COVID-19 symptoms to report their illness to their superiors.

81.     The JBS Defendants did not require these workers to self-quarantine at home, despite federal guidance to the contrary.

82.     In a demonstration of placing profits over safety, the JBS Defendants ignored the health of their vulnerable workers and did not shut any plants prior to March 30, 2020 despite a mountain of evidence of a public safety concern of unforeseen magnitude.

(See Doc. No. 17 at Ex. E at ¶¶ 8-11, 60-66, 79-82.)

As stated previously, sentences that start with "Based upon information and belief" were prepared after *extensive* investigation was conducted by Plaintiff's counsel. This investigation included dozens of interview of witnesses with direct knowledge of the outrageous conduct. Moreover, the above is merely a *sampling* of the allegations contained in Plaintiff's Complaint that meet the standard set forth in Martin. (See also Doc. No. 17 at Ex. E at ¶¶ 157-186.)

If JBS wants to attempt to prove that the allegations in the Complaint are *wrong*, that is their prerogative. But actively pretending those averments don't exist renders JBS' entire Martin analysis hollow. JBS can defend the Saturday Kills in March 2020 and the work-while-sick

policy during the COVID outbreak to a jury. However, they ask this Court to ignore those allegations entirely. This is fundamentally inappropriate on a Notice of Removal and requires Plaintiff's Motion to Remand be granted.

Finally, JBS fails to once again address an important factual allegation raised by Plaintff. JBS allegedly enacted a policy of sending home at-risk employees on March 20, 2020:

> "We understand the family's frustration and sympathize with them. Our team member had not been at work since March 20, 2020. He was on vacation and scheduled to return to work on March 30, 2020. However, on March 20, 2020, JBS USA instituted a policy that removed high risk populations from our facilities, including those more than 70 years of age. Given his age, we informed him he was a part of a high risk population while he was on vacation and encouraged him to stay home, which he did. He was never symptomatic while at work and never worked in the facility while sick.

(See Doc. No. 20 at Ex. F (emphasis added).)

If JBS instituted a company-wide policy to send at-risk employees home on March 20, 2020, then JBS must address why Enock Benjamin was compelled to work for an additional seven (7) days in an *admittedly unsafe* environment. It is difficult to take JBS's arguments seriously when they fail to address this policy in their opposition.

For all these reasons, Plaintiff's intentional tort claims sounding in fraudulent and intentional misrepresentation must stand, regardless of which entity is ultimately determined to be Mr. Benjamin's employer.

> **D.      This Court should not assert federal question jurisdiction as JBS's continued reliance on Grable strains credibility.**

JBS continues to improperly assert that this Court should assert federal question jurisdiction. Plaintiff's counsel elected not to engage in a full throated analysis of Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg., 545 U.S. 308 (2005) for a simple reason: that case is so utterly inapplicable that thorough analysis was unwarranted. However, JBS seems

intent on embracing a holding that it *knows* is inapplicable and it *knows* was subsequently distinguished by <u>Empire HealthChoice Assur., Inc. v. McVeigh</u>, 547 U.S. 677 (2006).

In fact, JBS cites to <u>Grable</u> dozens of times without bothering to provide a factual background. <u>Grable</u> involved a quiet title action based on "claims of title to land obtained at a federal tax sale…raising a disputed issue of federal title law."  545 U.S. at 310.  The Court stated that the purpose was to provide "a federal forum for federal tax litigation," and its reasoning was premised on the fact that the "meaning of a federal tax provision is an important federal-law issue that belongs in federal court."  <u>Id.</u> at 308-309.  The court noted the fact that "quiet title actions hav[e] been the subject of some of the earliest exercises of federal-question jurisdiction over state law claims."  <u>Id.</u> at 315 (internal citations omitted).

Under <u>Grable</u>, federal question jurisdiction in a state law case is proper *only* if "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  <u>Gunn v. Minton</u>, 568 U.S. 251, 258 (2013).  A defendant seeking to invoke federal question jurisdiction must satisfy all four factors.  <u>Id.</u>[4] As is set forth in detail below, although JBS would need to satisfy all four factors, it is incapable of satisfying *any of them*. This is in large part due to the cases that followed and interpreted <u>Grable</u>, starting with <u>McVeigh</u>.

<u>McVeigh</u>, involved a state court tort action. In <u>McVeigh</u> the Supreme Court held that the federal question jurisdiction standard set forth in <u>Grable</u> is ***limited*** for three reasons: (1) <u>Grable</u> concerned whether the IRS's actions were compatible with a federal statute; (2) <u>Grable</u> "presented a nearly 'pure issue of law,' one 'that could be settled once and for all and thereafter would govern numerous tax sale cases'"; and (3) even though <u>McVeigh</u> involved the

---

[4]      In <u>Gunn,</u> the Supreme Court found that there was **no** federal question jurisdiction over a state law malpractice claim which arose from an underlying patent litigation.  568 U.S. at 259. As such, JBS's reliance on this case is curious.

government's "overwhelming interest . . . in the health and welfare of federal workers upon whom it relies to carry out its functions," *it still did not meet the level of government interest needed under <u>Grable</u>.* <u>Id</u>. at 700-701 (internal citations omitted).

Federal decisions that have followed <u>Grable</u> and <u>McVeigh</u> recognized a fact that JBS intentionally omitted from its' opposition. Namely that <u>Grable's</u> application is "rare" and that it "would not affect usual litigation." <u>Yellen v. Teledne Continental Motors, Inc.</u>, 832 F. Supp. 2d 490, 497 (E.D. Pa. 2011) (finding that <u>Grable</u> did not create federal question jurisdiction in personal injury aviation action); <u>see also</u> <u>Gunn</u>, 568 U.S. at 257-58 ("where a claim finds its origins in state rather than federal law…we have identified a 'special and small category' of cases in which arisising under [federal question] jurisdiction still lies.").

<u>Grable</u> does not apply to this case where no "pure issue of law" is presented because this case is "fact-bound and situation-specific." <u>McVeigh</u>, 547 U.S. at 701. Plaintiff's Complaint does not ask whether there was a *per se* violation of federal law or guidance—it considers OSHA and CDC guidance in the way state courts have in workplace accident cases for decades. See *Pa. SSJI (Civ.) 13.110*.

JBS makes the same arguments here that <u>Grable</u> cautioned against and <u>McVeigh</u> said were inapplicable to this case. As set forth below, a review of each <u>Grable</u> factor reveals why applying the <u>Grable</u> standard to the instant case would be a misapplication of precedent.

### i.    *Factor 1: Plaintiff's Complaint does not raise a federal question.*

JBS's argument that failure to adhere to OSHA and/or CDC guidance "necessarily raises" a federal issue is not only specious, but entirely devoid of precedential support. To the contrary, district courts have held that OSHA standards do not give rise to federal question jurisdiction. <u>See, e.g. Goforth v. Nevada Power Co.</u>, 101 F. Supp. 3d 975, 978 (D. Nev. 2015) (finding that

alleged OSHA violations—and indeed a negligence *per se* claim for OSHA violations—did not give rise to federal question jurisdiction under *Grable* in a workplace accident case).

In Goforth, the court held that "[w]hen a claim can be supported by alternative and independent theories—one of which is a state law theory and one of which is a federal law theory—federal question jurisdiction does not attach because federal law is not a necessary element of the claim." Id. at 978 (quoting Rains v. Criterion Sys., Inc., 80 F.3d 339, 346 (9th Cir. 1996)); see also Glanton v. Harrah's Ent., Inc., 297 F. App'x 685, 686-87 (9th Cir. 2008) (alleged OSHA violations of EPA, OSHA, and federal statutes and regulations in state law action did not give rise to federal question jurisdiction under Grable); Blankenship v. Bridgestone Americas Holding, Inc., 467 F. Supp. 2d 886, 898-99 (C.D. Ill. 2006) (alleged violations of OSHA in toxic tort wrongful death case did not give rise to federal question jurisdiction under Grable); Ahmad v. Alcoa, Inc., 2009 WL 10672159, at*3-4 (C.D. Cal. Jan. 27, 2009) (same).

Because Plaintiff's claim here are not entirely dependent upon proving a failure to adhere to OSHA or CDC guidance, this case does not raise a federal question under Grable. See, e.g., Manning v. Merrill Lynch Pierce Fenner & Smith, Inc., 772 F.3d 158, 164 (3d Cir. 2014) ("even if Plaintiffs' claims were *partially* predicated on federal law, federal law would still not be necessarily raised."); Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 816-17 (4th Cir. 2004) ("A plaintiff's right to relief for a given claim necessarily depends on a question of federal law only when *every* legal theory supporting the claim requires the resolution of a federal issue.").

Accordingly, JBS failed to satisfy the first Grable prong.

### ii.   *Factor 2: There is no actual dispute as to a federal regulation.*

Defendant raises a strawman argument here: assuming that an actual dispute as to OSHA and CDC guidance exists merely because the guidance is referenced in Plaintiff's Complaint.

16

This is **not** the <u>Grable</u> standard.

Instead, JBS must actually prove that there is a conflict, not pontificate over whether one may arise later. This point is made clear by the cases cited by JBS. For instance, in <u>U.S. Express Lines Ltd. v. Higgins</u>, 281 F.3d 383, 391 (3d Cir. 2001), federal question jurisdiction was proper only where the court *already* recognized a clash between a federal rule of civil procedure and a federal appellate decision. Here, there is no conflict, and zero precedent that it would be improper for a jury to consider evidence of failure to adhere to OSHA and/or CDC guidance as *some* evidence of a breach of a duty of care.

Accordingly, JBS has failed to meet the second <u>Grable</u> prong.

### iii.  *Factor 3: OSHA and CDC guidelines do not raise a substantial question of federal law.*

As set forth above, OSHA violations are not considered evidence of *per se* negligence in Pennsylvania, so a state court need not determine whether the Defendants actually violated OSHA. <u>See, e.g.</u> <u>Goforth</u>, 101 F. Supp. 3d at 979 (resolution of the OSHA violation at issue was not substantially important to the federal system because it required "a case-specific determination of whether Defendants violated certain OSHA regulations."); <u>McGuire v. Palmerton Hosp.</u>, 2012 WL 2362488, at * 3 (E.D. Pa. June 20, 2012) (rejecting application of <u>Grable</u> in wrongful death case and reasoning that "claims that refer to federal public policy do not necessarily lead to arising-under jurisdiction.").

Applying the test as previously set forth by courts in this district, a substantial issue has not been raised in this case because the issue here does not "present a pure legal question," and the "federal law underlying the issue [does not] provide . . . for a federal cause of action." <u>Ali v. DLG Development Corp.</u>, 283 F. Supp. 3d 347, 354 (E.D. Pa. 2017).

Resolving whether JBS violated OSHA regulations in this case would not resolve any substantial question of federal law because this fact-specific inquiry would not resolve *every* meatpacking plant Covid-19 infection case.  McVeigh, 547 U.S. at 700-701 (explaining that Grable involved a substantial question of federal law where it involved purely legal issues and raised a question "'that could be settled once and for all and thereafter would govern numerous tax sale cases'").

For these reasons, JBS cannot satisfy the third Grable factor.

> ### iv.     *Factor 4: If this Court retained jurisdiction, it would disrupt the federal-state court balance.*

JBS assumes this point without advancing any real argument. However, stripping this case from the state court docket poses a substantial threat to workplace accident litigation going forward.  JBS's proposal would create a situation where every claim where it is alleged that a defendant has failed to adhere to OSHA guidance would necessarily invoke federal question jurisdiction.  Thus, the flood of litigation that such a ruling would uncork is not limited only to Covid-19 infection cases.  It will expand to all workplace litigation.  This is exactly the fear that McVeigh, and nearly every federal court since has voiced.

Indeed, *there is a reason* that courts across the country and this Court in particular have rarely invoked Grable and asserted jurisdiction over a state law claim.  See, e.g. McLaughlin v. Bayer Essure, Inc., 2018 WL 3535142 (E.D. Pa. July 23 2018) (Padova, J.) (finding that Grable did not apply to state law claims); Abington Twp. v. Crown Castle NG East LLC, 2017 WL 57142 (E.D. Pa. Jan. 5, 2017) (Padova, J.) (same); Conklin v. Moran Industries, Inc., 2011 WL 2135647 (E.D. Pa. May 31, 2011) (Padova, J.) (same).

For all of these reasons, this Court should reject the application of Grable and find that JBS cannot prove that this Court should assert federal question jurisdiction.

## V.    CONCLUSION

It is well-settled that "[t]he defendant's right to remove and the plaintiff's right to choose the forum are not equal, and uncertainties are resolved in favor of remand." 16 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 107.05 (3d ed. 2003) (internal cross-reference omitted); Steel Valley Auth., 809 F.2d at 1010. Accordingly, if there is *any doubt* as to the propriety of JBS' removal, then this case should <u>not</u> have been removed to federal court. Brown v. Francis, 75 F.3d 860, 865 (3d Cir. 1996).

For all of the reasons set forth above and previously advanced in Plaintiff's Motion to Remand, it is clear that JBS cannot meet its burden to prove that removal to this Court was proper. There are simply too many factual disputes that should result in this matter being remanded to Philadelphia County. Boyer, 913 F.2d at 111.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court grant this Motion and enter an Order remanding this matter to Philadelphia County.

**Respectfully submitted,**

BY:____*/s/ rjm9362*_____
ROBERT J. MONGELUZZI; ID No. 36283
STEVEN G. WIGRIZER, ID No. 30369
JEFFREY P. GOODMAN; ID No. 309433
JASON S. WEISS; ID No. 310446

**SALTZ MONGELUZZI & BENDESKY P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
(215) 496-8282

*Attorneys for Plaintiff, Ferdinand Benjamin,*
*individually and as the Personal Representative of*
*The Estate of Enock Benjamin, deceased*

<u>dated</u>: July 22, 2020

19

# EXHIBIT A-1

    🔍 Search           Try Premium Free
for 1 Month

**Are You an Attorney? -** 62 new legal clients seeking a local attorney no



# Matthew Lovell SPHR SHRM-SCP · 3rd

Head of Labor Relations and Safety

Arvada, Colorado · 500+ connections · **Contact info**

🔒 **Message**

   **JBS USA**

   **Western Governor**

## About

Driven and proven Human Resources Leader with continuing success as a business partner in large complex organizations. Adept at aligning multiple business units behind common objectives, developing individuals a performing teams, building long term Human Resources strategies in support of overall business objectives, a change. Experienced with lean manufacturing concepts, root cause analysis, and process improvement.

Experienced in all facets of Human Resources with expertise in: Employee and Labor Relations; Legal Complia Organizational Development; Recruiting and Retention at all levels; Coaching and Employee Engagement; Per Management; Compensation and Benefits; Talent Management; and Workforce and Labor Sustainability.

Specialties: Human Resources Compliance, Talent Management, 360 Evaluations, Performance Management, Planning, Compensation, Benefits, Employment Law, Change Management, Culture, Values, Labor and Emplo Relations, Union Negotiations, Collective Bargaining, Strategic Relationship Building, Government Employer R Human Resources Management and Development, Organizational Change and Development, Workforce Plan Staffing, Human Resources, HR, SPHR, PHR, Director, Business Partner, Generalist, Sustainability.

## Activity

1,953 followers

   **Messaging**

       

Try Premium Free
for 1 Month

Matthew shared this
2 Reactions

Matthew shared this
3 Reactions



**The World's Largest Meat Seller Embraces Plant-Based Proteins As Pandemic...**

Matthew shared this
7 Reactions • 1 Comment



**We have embarked on a com 'Chicken Run' initiative, takin**

Matthew shared this
3 Reactions

## Experience



**JBS USA**

12 yrs 2 mos



**Head of Labor Relations, Health and Safety**
Full-time
May 2018 – Present · 2 yrs 3 mos
Greeley, CO

Lead all aspects of the Company's Labor Relations, Occupational Health, and Safety programs fc the United States, Canada, and Puerto Rico consisting of more than 70 production facilities, 120 medical providers, and 65,000+ employees.

Advise Senior Executives (CEO down) regarding Safety, Occupational Health, and Labor Relation strategies and decisions.

Develop and delivers regular training at all levels of the organization from hourly employees up.

Develop and maintain the Company's Labor Relations philosophy and strategies.

Lead the full life cycle of collective bargaining for more 40 collective bargaining agreements, including bargaining strategies, costing of proposals, bargaining and implementation.

Lead and align 10 executive safety leaders across several distinct business units.

Manage relationships with various labor union at local and international levels including the UFC IBT, USW, RWDSU, IUOE, Carpenters, and BCTGM.

Develop compensation and benefit strategies for US hourly workforce.

Lead all union avoidance campaigns and strategies.

Manage all labor arbitrations an unfair labor practice charges.

Main contact for outside legal counsel.

Develop, rollout and maintain occupational health treatment protocols for onsite medical servic

Ensure long term value for the organization by leading culture driven safety programs, aligning. business around risk mitigation strategies to proactively reduce injuries and illness, developing cutting edge processes for data gathering and analysis.

Strategically align practices to ensure compliance with government rules and regulations while maintaining operational efficiency.

Key participant in merger and acquisition implem

Team impacts more than $100M is economic cha

Messaging

 

Try Premium Free
for 1 Month

### Labor Relations Manager

May 2012 – Present · 8 yrs 3 mos

Greeley, CO

Responsible for Labor Relations and Chief Negotiator for over 38 labor agreements, covering mo
than 36,000 employees.
Develop and implement organization wide labor strategy and philosophy.
Built and maintain relationships with the UFCW, USW, IBT, BCTGM, RWDSU, F&O, IUOE, a ...see n

### Head of Human Resources Compliance

Nov 2010 – May 2012 · 1 yr 7 mos

Greeley, Co

Directed the Human Resources Compliance program for North America
Responsible to set and implement the Company's overall compliance strategy.
Developed and implemented full scale HR audits for the field locations.
Managed all locations AAPs and monthly, quarterly, and annual reporting     ...see n

### Head of Hiring and Development (Beef)

Jul 2010 – Nov 2010 · 5 mos

Greeley, CO

Managed business unit wide internal development programs, implemented a comprehensive go
setting and tracking program, and developed strategies for recruitment and retention of key
salaried positions.

### Human Resources Manager (Beef Plant)

Jun 2008 – Jul 2010 · 2 yrs 2 mos

Greeley, CO

Managed relationships with two unions encompassing a total of 2700 members.
Processed grievances at various steps of the grievance process including arbitration.
Managed complex labor issues and disputes as they arouse.
Provided guidance regarding Human Resources related legal and compliance concerns.   ...see n

### Consultant (Contract)

Fiserv

Apr 2008 – Nov 2008 · 8 mos

Ensured existing applicant tracking system (Ceridian) and interview process was in compliance w
various EEO regulations



Messaging

     

Try Premium Free
for 1 Month



5280 Solutions

Aug 2007 – Apr 2008 · 9 mos

Full life cycle recruitment and hiring of specialized IT positions.

### Account Representative/Recruiter

Advantage Human Resourcing

Mar 2007 – Aug 2007 · 6 mos

Provided on-site support to Dex Media company through recruiting and managing their conting
workforce across their nationwide foot print.
Built and maintained strategic relationships with managers to help achieve sales goals.

### Consultant (Contract)

Video Professor

Aug 2006 – Mar 2007 · 8 mos

Developed and implemented hiring strategies for call center employees through senior level
management.
Trained all hiring managers on proper interview techniques.

Show 1 more experience ⌄

---

## Education



**Western Governors University**

Bachelor's degree, Human Resources Management

---

## Licenses & Certifications



**Certificate of Achievement, SPHR Preparation Course**

Colorado State University

Issued 2013 · No Expiration Date

---



**Senior Professional in Human Resources (SPHR)**

HR Certification Institute - HRCI

Issued 2013 · Expires Mar 2023

See credential

 **Messaging**



SHRM
Issued Feb 2015 · Expires Mar 2021

See credential





Messaging

(2) Matthew Lovell SPHR SHRM-SCP | LinkedIn

     

Try Premium Free
for 1 Month



Messaging

# EXHIBIT A-2



### Matthew Lovell, SPHR, SHRM-SCP's Email and Phone

Corporate Labor Relations Manager @ JBS USA Holdings, Inc.

---

**Matthew Lovell, SPHR, SHRM-SCP's Email**

m****l@jbssa.com

m****7@gmail.com

**View Matthew's Contact Info**

It's free! Takes 5 seconds to sign up

| | |
|---|---|
| Location | Greater Denver Area |
| Work | Corporate Labor Relations Manager @ JBS USA Holdings, Inc. |
| | Human Resources Manager (Beef Plant) @ JBS |
| | Consultant (Contract) @ Fiserv |
| | Technical Recruiter @ 5280 Solutions |
| Education | No education info found. |

Not the Matthew Lovell, SPHR, SHRM-SCP you are looking for?



## Search 1.5 billion Email & Phone#

Browse to anyone's Linkedin profile, and Contactout will find that person's email address and phone number

Start your free trial

★★★★☆   (300+ Reviews)

## Contactout is used by recruiters at 30% of the fortune500



*Find More Candidate Contact Information In 2017 With ContactOut - eremedia.com*

*One of the most accurate email finding tools we've found...it's been endorsed by some industry heavy hitters including Dean Da Costa - socialtalent.co*

*Find a personal email for 65% of the western world - techcrunch*

# Ready to try ContactOut?

### Start your free trial

★★★★☆    (300+ Reviews)

People also viewed these profiles

| | | |
|---|---|---|
| **Slobodan Veckalov**<br>Managing Director @ AVL Projekt<br>Serbia | **Rebecca Jesus**<br>Kuala Lumpur, Malaysia | **Jeff Keller**<br>Outreach and Operations Manager @<br>North American Board of Certified Energ...<br>Albany, New York Area |
| **Shahin Salmon-Fattahian**<br>Accounting Manager @ Reflektive<br>San Ramon, California, United States | **Mary O'Hara Mary O'Hara Stacy**<br>Greater Milwaukee Area | **Matthew Phillips**<br>Vice President of Operations @ Samson<br>Resources<br>Tulsa, Oklahoma Area |
| **Karthik Gadiyar**<br>Cyber Risk Advisory Professional @<br>Coalfire Systems, Inc.<br>Newport Beach, California, United States | **Guy Naveh**<br>Na'an, HaMerkaz (Central) District, Israel | **Millain Roberts**<br>Romford, United Kingdom |
| **Alejandro Salazar**<br>Corporate Counsel @ Ruhrpumpen Global<br>Centro de San Pedro Garza García, Nuevo<br>León, Mexico | **Al Motts**<br>San Francisco Bay Area | **Upinder MS**<br>Senior Vice President and GM @ MTI<br>Electronics (A Virtex Enterprises...<br>Greater Milwaukee Area |



ContactOut

Privacy    Terms
©2016 ContactOut, All rights reserved
sitemap: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37 |
1, 2, 3, 4, 5, 6, 7,

# EXHIBIT A-3

## Company & Contact Directories

Companies (/directory /company/list/)

Contacts (/directory/person /list/)

**Contact Details for Matthew Lovell**

# Matthew Lovell

## Human Resources Supervisor

### Contact Information

Phone: **(970) 506-8000**

Email: *Please log in (/login) or register (/register) to see the details.*

### Social Links

Twitter: *Please log in (/login) or register (/register) to see the details.*

Facebook: *Please log in (/login) or register (/register) to see the details.*

LinkedIn: *Please log in (/login) or register (/register) to see the details.*

Google+: *Please log in (/login) or register (/register) to see the details.*

### Company Information

Name: **JBS USA Holdings, Inc.**

Address: **1770 Promontory Circle Greeley CO 80634**

Phone: **970-506-8000**

Website: **http://www.jbsswift.com/ (http://www.jbsswift.com/)**

**View Complete Company Profile (/directory /company/jbs-usa-holdings,-inc./4402158)**

**Claim Profile**

**Is this you?** Claim your profile to update and/or remove this information.

Quality score

# 96

out of 100

### Others with Similar First and Last Names

First Name
Last name
Title
Company Name

Matthew
Lovell
Assistance Criminal District Attorney
Bexar County Information Services
(/directory/person/matthew-lovell/500265119)

Matthew
Lovell
Residence Director
Juniata College
(/directory/person/matthew-lovell/4469638)

Matthew
Lovell
Associate
Kirkland & Ellis LLP
(/directory/person/matthew-lovell/9926656)

Matthew
Lovell
Human Resources Supervisor
JBS USA Holdings, Inc.
(/directory/person/matthew-lovell/6234343)

Matthew
Lovell
Partner
Sedgwick LLP
(/directory/person/matthew-lovell/501384948)

List of colleagues of Matthew Lovell at JBS USA Holdings, Inc.

First Name
Last name
Title

Brian
Mossong
Administrator Information Systems Jbs Swift and Co
(/directory/person/brian-mossong/16882762)

Wesley
Batista
President Chief Executive Officer and Director
(/directory/person/wesley-batista/22107678)

Albert
Velasquez
Training Manager
(/directory/person/albert-velasquez/17903921)

Jack
Turner
Security Manager
(/directory/person/jack-turner/21389616)

Kevin
Jass
Director of Information Technology Systems
(/directory/person/kevin-jass/22758989)

Kristi
Hoburg
Marketing, Beef Division
(/directory/person/kristi-hoburg/22945521)

Rick
Lynch
Lead Database Administrator
(/directory/person/rick-lynch/25456345)

Susan
Thornal
Manager of Information Technology Applications
(/directory/person/susan-thornal/26601014)

Timothy
Conway
Unix Systems admin
(/directory/person/timothy-conway/26882412)

Wesley
Bagista
Chief Financial Officer
(/directory/person/wesley-bagista/27364081)

John
Ruby
Microbiology Researcher
(/directory/person/john-ruby/22163928) 

Dan
Norby
Finance Executive
(/directory/person/dan-norby/19569118)

Karen
Dilka
Accounts Payable Manager
(/directory/person/karen-dilka/22548536)

Dean
Schott
Information Technology
(/directory/person/dean-schott/19824350)

William
Trupkiewicz
Vice President, Controller, Chief Administrative Officer
(/directory/person/william-trupkiewicz/18808622)

Martin
Dooley
Senior Vice President and Head, Pork and Lamb Operations
(/directory/person/martin-dooley/4622227)

Andre
Nogueira
Chief Financial Officer
(/directory/person/andre-nogueira/18025925)

Matthew
Lovell
Human Resources Supervisor
(/directory/person/matthew-lovell/23791861)

# EXHIBIT A-4

**Breaking News**   Two dead, two missing after early morning house fire in Arvada   Ju

**BUSINESS** • News

# Fifth local JBS employee dies from coronavirus as union, company trade shots



Andy Cross, The Denver Post

Exterior of the JBS Greeley Beef Plant April 23, 2020. Over 100 employees tested positive for the disease, three plant employees have died, and one (non-plant) JBS corporate employee also passed away.

By **SHELLY BRADBURY** | sbradbury@denverpost.com | The Denver Post

PUBLISHED: April 27, 2020 at 10:33 a.m. | UPDATED: April 27, 2020 at 5:42 p.m.

13

A fifth employee at the JBS USA plant in Greeley died Sunday after contracting the novel coronavirus, according to the United Food and Commercial Workers Union Local 7.

Four workers at the Greeley beef plant have now died, as well as one person who worked at the JBS corporate office. The death of plant employee Way Ler, 61, comes two days after JBS reopened its Greeley plant after a nine-day closure prompted by the spread of the novel coronavirus among employees.

The plant reopened Friday after the company installed a variety of protections for workers designed to slow the spread of the virus, and most employees will return to work Monday, despite ongoing concerns about worker safety and a lack of testing for employees.



On Friday, JBS sent the union a cease-and-desist letter alleging that union president Kim Cordova violated the collective bargaining agreement between the workers and the company by speaking publicly about safety concerns at the plant.

United Food and Commercial Workers International Union

Way Ler, 61

"In particular, it seems the Local has adopted a strategy of generating negative media attention and public opinion in an effort to unwind agreements made in the CBA and gain concessions from the Company as they relate to employee safety," Matthew Lovell, JBS head of labor relations, wrote in the five-page letter. He wrote that the union was contractually obligated to address safety concerns through a grievance process and prohibited from taking actions outside of that process.

Cordova dismissed that allegation in a return letter Saturday.

"Neither Local 7's nor our members' First Amendment rights are checked at the grievance procedure door," she wrote. "The grievance procedure does not reduce Local 7 to a status of mute and abject servility."

At least 102 JBS employees have confirmed cases of the novel coronavirus, although health officials believe the outbreak is larger and several hundred employees and their family members may be infected. About 3,400 employees work at the Greeley plant.

The spread of COVID-19 among workers is a problem faced across the meat packing industry, with plants throughout the country dealing with outbreaks as employees work in close quarters for long hours.

On Sunday, the Centers for Disease Control and the Occupational Safety and Health Administration released guidelines for the meat packing industry. The measures include ensuring employees work at least six feet from each other or are separated by physical barriers, increasing hand sanitation stations, adjusting fans and ventilation systems, staggering shift and modifying sick leave policies to encourage workers to stay home if ill, among other measures.

The guidelines also suggest that in some plants, one shift each day may need to be reserved for disinfecting and sanitation. That's the strategy underway at the Cargill plant in Fort Morgan, which has reported 15 confirmed cases and one death and has reduced shifts to allow for cleaning.

The Leprino Foods cheese plant, also in Fort Morgan, announced a five-day closure starting Sunday after a high number of employees tested positive for the virus. In that case, the company intends to test all plant employees, about 350 people, before reopening the plant.

# Popular in the Community



Policies
Report an Error
Contact Us
Submit a News Tip

The Trust Project

TAGS:    **CORONAVIRUS**,    **CORONAVIRUS IN COLORADO**,
**JBS USA**

**Shelly Bradbury** | Breaking News Reporter
Shelly Bradbury is a breaking news reporter who joined The Denver Post in
November 2019. She previously worked as a crime reporter at the
Pittsburgh Post-Gazette in Pennsylvania and the Chattanooga Times Free
Press in Tennessee. She's been a reporter since 2012, focused on criminal
justice, breaking news and enterprise. In Pittsburgh, she helped the
newspaper earn the 2019 Pulitzer Prize for breaking news after a mass
shooting at a local synagogue.

sbradbury@denverpost.com    Follow Shelly Bradbury **@shellybradbury**



SPONSORED CONTENT

**Diabetics: Avoid One
Green Veggie That
Inflames Blood Sugar.**

By Health Truth Finder



Watch How You Can Take
Control Of Your Blood Sugar And Get Relief From Type 2 Diabetes.

13

# EXHIBIT A-5



MAKING YOUR WORLD STRONGER

April 24, 2020

Kim Cordova
President
United Food and Commercial Workers Union, Local 7
7760 West 38th Avenue, Suite 400
Wheat Ridge, CO 80033

Re: Cease and Desist Violations of the CBA

Ms. Cordova:

As you know, both the United Food and Commercial Workers Local 7 ("Local") and JBS USA Food Company ("JBS" or "Company") face unchartered territory in working through the many challenges presented by COVID-19. Of course, we are both committed to ensuring employee safety while the Company's Greeley processing facility ("facility") maintains its operations. In light of this perilous situation, it is now more important than ever that the parties work together to adhere to their obligations under the collective bargaining agreement ("CBA") and maintain labor peace.

Despite the importance of working together in this difficult time, it has come to the Company's attention that the Local continues to engage in various activities designed to obtain – by means other than the grievance and arbitration process – outcomes governed by the CBA. In addition to the Local's outright encouragement of unlawful self-help, we are aware of additional statements to the media and directly to employees subverting and otherwise violating express provisions of the CBA. In particular, it seems the Local has adopted a strategy of generating negative media attention and public opinion in an effort to unwind agreements made in the CBA and gain concessions from the Company as they relate to employee safety. These efforts, and the Local's direct encouragement that employees withhold production clearly violate the no-strike commitments set forth in the CBA, among other provisions. I write to demand that you and all other agents of the Local cease and desist this conduct immediately.

**Relevant Provisions of the CBA**

*Article 3 – Safety*

Article 3 provides that the Company "has the sole responsibility to provide a safe and healthy workplace and to correct safety and health hazards" and that "[n]othing in th[e] agreement shall imply that the Union has undertaken or assumed any portion of that responsibility." *Article 3, Section 1(A)*. Further, it was agreed that the "Company shall furnish all safety equipment necessary for the protection of hourly employees." *Article 3, Section 4*. Finally, the parties committed that disputes over the Company's compliance with this Article would be referred to grievance procedure. *Article 3, Section 6*.



If the Local believes the Company is not providing adequate PPE or should take other safety measures, its sole remedy is to file a grievance. In recognition of this exclusive remedy, on March 27, 2020, the Local filed a grievance alleging the "Company violated the CBA by failing to provide proper PPE and a safe workplace for its workers as a result of the COVID-19 pandemic." That grievance is pending, and the parties are processing it in the usual course. Under these circumstances, the Local is not permitted to engage in self-help, mobilization, or corporate campaign activities against the Company outside of the grievance process in an effort to compel the Company to take specific safety precautions that the Local has alone determined should be implemented.

*Article 8 – Company and Union Responsibility*

As you know, Article 8 of the CBA states that "there shall be no strike, stoppage, picketing, honoring of any picket line, sympathy strike, slowdown, deliberate withholding of production or suspension of work on the part of the Union, its members, or any individual covered by this Agreement for any reason whatsoever."

To be sure, this language is quite broad: it not only prohibits a "strike" in the traditional sense, but the Local has also agreed that it – and none of its members or anyone within the bargaining unit – will withhold or suspend production *for any reason whatsoever*. Thus, any act by the Local, its members, or anyone within the bargaining unit to withhold work or refuse to perform work constitutes a violation of this provision. The Company interprets this language to prohibit bargaining unit members from refusing to perform work because they have – contrary to guidance from local, state, and national health officials – unilaterally decided it is not safe to work. It also prohibits the Local from encouraging – whether directly or indirectly – that employees withhold production by refusing to work.

Also, under the express terms of Article 8, if such conduct occurs – either by the Local directly or any member of the Local or bargaining unit employee – then the "Union shall immediately declare publicly that such action is unauthorized and shall promptly order its members to resume their normal duties . . . " The Company expects the Union to maintain its contractual obligations not only to refrain from conduct prohibited by the CBA, but to *publicly* disclaim its position (more fully described below) that employees "have the right to refuse to work" and to direct employees that they must immediately return to work.

*Article 35 – Waiver, Entire Agreement, and Severability*

Pursuant to Article 35, the parties' agreed that the current CBA is "the complete Agreement providing all benefits to which any employee may be entitled, and it is expressly understood and agreed that the Company has no obligation to any employee or employees other than those provided herein." *Article 35, Section 1*. Further, the parties explicitly waived the right "to bargain collectively with respect to any subject or matter referred to or covered in th[e] Agreement . . . even though such subjects or matters may not have been within the knowledge or contemplation of either or both of the parties at the time that



they negotiated or signed th[e] Agreement. *Article 35, Section 2*. Thus, pursuant to this Article, the Local cannot take any actions against the Company in an effort to coerce it to provide additional benefits to employees or renegotiate any provisions of the CBA.

**The Local's Conduct**

Throughout the last several weeks, the Local has engaged in a multi-faceted corporate campaign against the Company in an effort to coerce the Company to grant specific health and safety protocols demanded by the Union. Most recently, in a letter you sent dated April 21, 2020, you outlined more than three dozen protocols the Local wants to be implemented at the facility. Those demands span all manner of health and safety procedures, ranging from plant wide testing, to the Company's use of security guards, to the type of PPE employees are provided and how frequently they are provided. As you stated, "[t]he purpose of this communication is to highlight . . . what we believe JBS must do before Local 7 can be comfortable that the plant is in a position to re-open." There are other references throughout your letter that indicate the Company must implement the Union's proposals or the Union will recommend employees not return to work. The implication of your statements is that the Union will encourage employees to withhold production unless the Local's demands are met.

The Local's threat to discourage employees from returning to work has been effectuated, in part, through its media campaign against the Company.[1] For example, in an interview provided to Channel 7 news and published on April 22, 2020, you are quoted as describing the facility reopening as "reckless and irresponsible and could potentially be a death sentence" . . . "this is a human rights issue, the rights of our workers are important and they should not be sacrificed."[2] The clear implication of this statement is that employees should not return to work. Indeed, your intent to discourage workers from returning is borne out by Tony Kovaleski's reporting that, "the Union is saying they are trying to fight every way they can to keep the plant closed." *Id.*

The very next day, April 23, 2020, you are quoted in a Denver Post article regarding the facility's reopening. In that article, you are quoted as saying, "I cannot stand up as president of the union and say it

---

[1] The Company has also received multiple reports from employees that the Local is explicitly encouraging them not to return to work and to engage in a protest of the working conditions. If those reports prove true, it is yet another clear violation of the CBA.

[2] Tony Kovaleski, Contact7 Investigates, https://www.thedenverchannel.com/news/investigations/this-could-potentially-be-a-death-sentence-jbs-union-president-responds-to-plans-to-reopen-plant. A similar statement appears in the Denver Post's April 23, 2020 article in which you are quoted as saying, "the [Company is] just going to reopen and they're giving my workers a death sentence." https://www.denverpost.com/2020/04/23/jbs-meat-plant-greeley-colorado-coronavirus-2/.



is safe to go back . . . and I think workers have the right to refuse to work in an unsafe environment."³ You made such a statement despite your apparent recognition that "the union's contract prohibits them from organizing a strike." *Id.*

It is unfathomable that you would recognize the Local's obligations under the CBA while at the same time state that employees have the right to engage in a work stoppage in direct violation of the CBA. As noted, no one – not the Local, Local members, or bargaining unit employees – may withhold production for any reason. Your statements to both the Company and the media suggesting that the plant should not reopen and that to reopen would be a "death sentence" for employees sends but one message: that employees should withhold production and not return to work. Moreover, your claim that employees "have the right to refuse to work" is absolutely false under the CBA.

The Local's conduct also violates Article 3 because it is attempting to improperly coerce the Company into implementing particular health and safety benefits outside of the grievance and arbitration process; namely, plant-wide COVID-19 testing, specific PPE, and other requirements.

Indeed, in your letter titled "Closure of JBS Plant in Greeley and your April 13 Letter" dated April 14, 2020 you boasted that "considerable state, federal, and local pressure" to commence a testing regimen was "generated in no small part by Local 7 . . ." *April 14, 2020 Letter*, p. 2. You go on to suggest that such efforts from the Local caused the Company to "bend[] to public pressure and the adverse publicity generated for JBS . . ." *Id.* Thus, not only have you conceded your intent to create negative publicity for the Company in an effort to force it to conform to the Local's demands, but you are apparently proud of your flagrant disregard for the Local's obligations under the CBA.

The Union's corporate campaign against the Company in an effort to obtain the specific safety protocols and health measures acts as a unilateral attempt to modify the CBA and is a violation of the National Labor Relations Act. The Local must immediately cease and desist its attempts to circumvent the CBA and extort additional benefits from the Company outside of the grievance and arbitration process.

If the Local is unsatisfied with the Company's response to the COVID-19 pandemic, its remedy is under the grievance and arbitration process of the collective bargaining agreement. The Local may also seek additional remedies in the next round of contract negotiations. The Local, however, may not extort additional benefits or concessions from the Company through media and political pressures, or by encouraging a work stoppage.

Based on the Local's statements, the Company now asks that it make a public declaration, consistent with Article 8 denouncing its claim (1) that reopening the facility is a "death sentence" for

---

³ Denver Post, April 23, 2020, *JBS to Reopen Greeley Beef Plant Friday Despite Ongoing Coronavirus Concerns*, https://www.denverpost.com/2020/04/23/jbs-meat-plant-greeley-colorado-coronavirus-2/.



employees and (2) that employees may refuse to work. The Local's public statement must also direct employees that they must immediately return to work. The Local's failure to make such an announcement is yet another violation of the CBA.

Further, please immediately cease and desist the Local's corporate campaign against the Company. If the Local continues to engage in such conduct in violation of the CBA, the Company will seek the federal court's intervention under Section 301 of the Labor Management Relations Act and will, specifically, seek an injunction prohibiting such behavior as well as money damages from the Local.

I appreciate your attention to these matters and hope we can work together to ensure employees are able to return to work safely and that the Company and Local are able to maintain labor peace.

Sincerely,

Matthew J. Lovell
Head of Labor Relations, Health and Safety
JBS USA